Freemont **GOODBAR, et al., Plaintiffs,**

**v.**

**WHITEHEAD BROTHERS, et al., Defendants.**

James W. **BEALE, et al., Plaintiffs,**

**v.**

**WHITEHEAD BROTHERS, et al., Defendants.**

James B. **BARRETT, et al., Plaintiffs,**

**v.**

**WHITEHEAD BROTHERS, et al., Defendants.**

**Civ. A. Nos. 82–0160–L, 83–0014–L and 83–0111–L.**

**No. C/P No. 83–2.**

United States District Court,
W.D. Virginia,

Lynchburg Division.

July 30, 1984.

Gregory P. Cochran, Lynchburg, Va., Donald Pendleton, Pendleton & Gamble, Amherst, Va., for plaintiffs.

John M. Oakey, Jr., McGuire, Woods & Battle, Richmond, Va., William B. Poff, Woods, Rogers, Muse, Walker & Thornton, William O. Tune, Jr., Gentry, Locke, Rakes & Moore, Roanoke, Va., James W. Morris, III, Browder, Russell, Morris & Butcher, Richmond, Va., Barbara Kacir, Cleveland, Ohio, Marianne Corr, Jones, Day, Reavis & Pogue, Washington, D.C., Gregory P. Cochran, Lynchburg, Va., George W. Wooten,

Woodward, Fox, Wooten & Hart, Roanoke, Va., Howard W. Rhodes, Jr., Rhodes, Jennings & Livingston, Henry M. Sackett, III, Edmunds, Williams, Robertson, Sackett, Baldwin & Graves, Lynchburg, Va., Frank B. Miller, III, Sands, Anderson, Marks & Miller, Richmond, Va., Mark Feldmann, Glenn, Flippin, Feldmann & Darby, Carroll D. Rea, Hazlegrove, Dickinson, Rea, Smeltzer & Brown, Roanoke, Va., Colin S.J. Thomas, Jr., Staunton, Va., Donald Pendleton, Pendleton & Gamble, Amherst, Va., C. Michael DeCamps, Cabell, Paris, Lowenstein & Bareford, Richmond, Va., J. Gorman Rosenberger, Jr., Kizer, Phillips & Petty, Alexander W. Bell, Bell, Morrison & Spies, Lynchburg, Va., for defendants.

## MEMORANDUM OPINION

KISER, District Judge.

Before the Court are Defendants' joint motions for summary judgment on the duty to warn issue. The parties have submitted various briefs and appendices in support of their respective positions, and oral argument was held on June 4, 1984. This matter is now ready for disposition by the Court pursuant to Fed.R.Civ.P. 56.

## BACKGROUND

### I. *Parties*

The three[1] above-styled cases were filed respectively on September 1, 1982; January 27, 1983; and July 29, 1983. These consolidated diversity actions present negligence and warranty claims of some 132 present and former employees[2] of the Lynchburg Foundry ("Foundry") against the following Defendants: Manley Brothers; Pennsylvania Glass Sand Corporation; Foseco, Inc.; Hardy Sand Company; Warner Company; Whitehead Brothers Company; American Colloid Co.; Babcock & Wilcox Company; C.E. Minerals; Fireline, Inc.; McIntyre Enterprises, Inc.; and Thomas H. Hardy, individually and trading as Hardy Sand Company. These twelve Defendants allegedly supplied to the Lynchburg Foundry silica sand or related products used in the casting process at the Foundry.

### II. *Facts*

The Lynchburg Foundry, a large manufacturer of metal castings, has foundry facilities in three different locations in Virginia: the Lower Basin and Archer Creek plants in Lynchburg and the facility in Radford. The Lower Basin, where these Plaintiffs were and/or are employed, is the oldest of the Lynchburg Foundry facilities. It began as a plow factory in 1899. In the late 1970s, the majority of the Foundry's approximately 4,500 employees were involved in the iron castings production process. Of this number, some 1,800 persons were employed at the Lower Basin plant which ran two to three shifts daily.

The molding process in foundries such as the Lynchburg Foundry utilizes enormous quantities of silica sand. In 1980, this industry employed 430,000 production workers and produced nearly 16 million net tons of castings valued in excess of 18 billion dollars. One estimate places the foundry industry's current annual sand consumption figure in excess of ten million tons.

Without getting into extensive detail about the intricacies of the entire casting operation at the Lower Basin plant, some background is necessary. Sand is supplied to the Foundry unpackaged in railroad car lots. According to one Foundry employee, sand has never been delivered to the

---

**1.** A fourth lawsuit, *Earl J. Tweedy, Jr. v. Whitehead Brothers Company, et als,* Civil Action No. 83–0045–L, was voluntarily dismissed pursuant to Fed.R.Civ.P. 41(a)(1) on June 5, 1984.

**2.** By Order dated June 18, 1984, the Court granted Defendants' Second Joint Motion for Summary Judgment as to ten (10) Plaintiffs that was based on the Virginia two-year statute of limitations, Code § 8.01–243(A). This Order, in conjunction with the voluntary dismissal of the *Tweedy* case, *see supra* n. 1, effectively reduced the ranks of active Plaintiffs in the lawsuits from 143 to 132. In addition to this second joint motion, individual Defendants have filed other motions based upon the statute of limitations against various individual Plaintiffs. Some of these motions for summary judgment have been granted as to certain named Plaintiffs, but for purposes of our discussion here, the specific Plaintiffs and Defendants affected need not be elaborated upon further.

Lynchburg Foundry in bags as opposed to railroad cars and occasional delivery in trucks. It is emptied from the cars onto conveyor belts or pneumatic transporters where it is conveyed to large tanks or sand silos for storage. Upon removal from storage, the sand is used in the various stages of metal castings production.

There are two casting facilities at the Foundry: the Green Sand and the Shell Molding plants. The former produces medium size iron castings such as engine blocks and transmission housings that weigh between 100 and 1,000 pounds. The Shell Molding plant produces smaller castings such as transmission, brake, and refrigerator parts ranging in weight from ½ to 100 pounds.

Basically, the sand is used to make the different cores and molds which are utilized in the molding process where molten metal is then poured into the molds. Next, comes the shakeout action where the mold is broken and the sand is removed from the newly made casting. In the knockout area, the riser insulating sleeves and pieces of excess metal used in the molding operation are cut or knocked off. Then the castings are cleaned by shot blasting and grinding machines. Finally, the new casting is inspected and moved to the warehouse.

As the silica sand and silica-related products are handled in the different casting production stages, the silica is fractured and respirable free-floating dust or free silica is produced. Those silica particles larger than 10 microns are captured or collected by the body's natural defenses. The particles at issue in this case measure between 2 and 10 microns in diameter and are invisible to the naked eye. They escape the natural barriers of the body, enter the lungs, and cause the formation of scar tissue or nodules which inhibits breathing. If inhaled in sufficient quantities over extended periods of time ranging from 5 to 20 years, the respiratory disease of silicosis results.

## LEGAL ANALYSIS

The complaints allege that Defendants supplied to the Lynchburg Foundry silica sand and silica-containing products including riser sleeves, coatings, clays, and other items used in the making of metal castings and that Defendants failed to advise the Foundry's employees with respect to the dangerous characteristics of silica products and how to protect themselves from them. As a result of their exposure to silica and respirable free silica, Plaintiffs claim that they each contracted silicosis.

Plaintiffs aver causes of action founded upon negligence, breach of express and implied warranties, and strict liability. The allegations of strict liability in tort have previously been dismissed by the Court since the Supreme Court of Virginia has not adopted the doctrine of strict liability set forth in the RESTATEMENT (SECOND) OF TORTS § 402A (1965).[3] *See Matthews v. Ford Motor Co.*, 479 F.2d 399, 401 n. 2 (4th Cir.1973); *Brockett v. Harrell Brothers, Inc.*, 206 Va. 457, 462–63, 143 S.E.2d 897, 902 (1965); *Moore v. Allied Chemical Corp.*, 480 F.Supp. 364, 376 (E.D.Va.1979); *Briggs v. Zotos International, Inc.*, 357 F.Supp. 89, 92 (E.D.Va. 1973). Beyond the express warranty claim alleged in the complaints, no suggestion of any evidence of any such warranty has been advanced by Plaintiff, either on brief or in oral argument. Va.Code § 8.2–313. Likewise, there has been no support for the implied warranty of fitness for a particular purpose. Va.Code § 8.2–315. Having found no basis for either the express or implied warranty for fitness claims in the cases at bar, this opinion will now focus upon the remaining legal theories of negligence and breach of the implied warranty of merchantability. *See* Va.Code § 8.2–314; *Featherall v. Firestone Tire & Rubber Co.*, 219 Va. 949, 961–64, 252 S.E.2d 358, 366–67 (1979); *Logan v. Montgomery Ward & Co., Inc.*, 216 Va. 425, 428, 219 S.E.2d 685, 687 (1975).

---

**3.** The parties agree that the law governing this diversity case is the law of Virginia. *Erie Railroad Co. v. Tompkins,* 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188 (1938).

Defendants preface their summary judgment argument by pointing out that for purposes of these motions only the Court may assume that all Defendants sold silica products to the Foundry in one form or another; that all Plaintiffs were exposed to all Defendants' products while employed at the Lower Basin plant; that Plaintiffs had no knowledge of the dangers associated with free silica; and that exposure to silica did result in silicosis. Although Manley Brothers and the remaining eleven Defendants submitted separate briefs, appendices, and argument in support of their motions for the summary judgment, I will not distinguish between them due to the close interrelationship of their arguments.

Essentially, Defendants have made a two-pronged argument on the duty to warn issue. They contend that there was no obligation on their part to warn the Foundry's employees of the risks of silicosis because: (1) silicosis is an occupational respiratory disease about which the foundry industry and, more importantly the Lynchburg Foundry, has been knowledgeable since at least the 1930's; and (2) only the Plaintiff's employer, the Lynchburg Foundry, can communicate any type of effective warnings.

In response, Plaintiffs principally argue that Defendant suppliers owed a non-delegable duty to warn about the dangers associated with the use of silica products not only to the Lynchburg Foundry, but more importantly its employees; and that these hazards are latent.

Neither party makes any distinction in their briefs or oral argument as to when the duty to warn arises in the negligence claim and when it arises in the implied warranty of merchantability claim. Both parties agree that the RESTATEMENT (SECOND) OF TORTS § 388 (1965)[4] con-

trols. *See Featherall v. Firestone Tire & Rubber Co., Inc.,* 219 Va. at 962, 252 S.E.2d at 366.

■ In many instances, this is true because the same defect or dangerous condition which makes it negligent for a supplier to fail to warn also makes the product defective under a warranty theory if no warning is given. Here, where the real thrust of the Defendants' argument is based upon the equal or superior knowledge of the purchaser, the Foundry, the theoretical underpinning as to the negligence and warranty claims are entirely different. In negligence, a supplier will be liable for failure to warn if its *conduct* is unreasonable under § 388 of the Restatement of Torts, whereas the duty to warn under a theory of implied warranty focuses upon whether the *lack of warning* renders the product unreasonably dangerous and thereby breaches an implied warranty arising under Va.Code § 8.2–315. *See Bly v. Otis Elevator Co.,* 713 F.2d 1040 (4th Cir. 1983); *Fischbach & Moore Intern. v. Crane Barge R–14,* 632 F.2d 1123 (4th Cir. 1980).

### I.

■ In the negligent failure to warn claim, the analysis under § 388 is that the supplier of the chattel (i.e. Defendants) is liable when he: (a) supplies a defective or dangerous product; (b) has no reason to believe that the user (i.e. the Plaintiff foundry employees) lacks knowledge of this defect or dangerous condition; and (c) cannot reasonably rely upon the purchaser/employer (i.e. the Foundry) to supply necessary warnings to Plaintiffs, the ultimate users of the product. Defendants have conceded, for argument purposes,

**4.** "§ 388. *Chattel Known to be Dangerous for Intended Use.* One who supplies directly or through a third person a chattel for another to use is subject to liability to those whom the supplier should expect to use the chattel with the consent of the other or to be endangered by its probable use, for physical harm caused by the use of the chattel in the manner for which and by a person for whose use it is supplied, if

the supplier (a) knows or has reason to know that the chattel is or is likely to be dangerous for the use for which it is supplied, and (b) has no reason to believe that those for whose use the chattel is supplied will realize its dangerous condition, and (c) fails to exercise reasonable care to inform them of its dangerous condition or of the facts which make it likely to be dangerous."

that the products they supplied contain a dangerous substance and that the Plaintiff users were not aware of these dangers. Thus, in view of these concessions on the first two prongs of § 388 and since all three provisions of § 388 must be satisfied before liability attaches, *see McKay v. Rockwell Intern. Corp.*, 704 F.2d 444 (9th Cir.1983), *cert. denied,* —— U.S. ——, 104 S.Ct. 711, 79 L.Ed.2d 175 (1984), this matter turns upon whether the requirements of clause (c) have been met, namely whether the Defendants failed to exercise reasonable care in relying upon the Foundry to supply its employees with the necessary information to satisfy the duty to warn.[5] For the reasons explained below, I find as a matter of law that there was a reasonable basis for Defendants in this litigation to rely upon the Foundry to give appropriate information of all the hazards of working with silica sand and related products to its employees.

### A.

▮ I begin my analysis of clause (c) of § 388 by turning to comment n of the official comments entitled "[w]arnings given to third person", which provides an explanation of this third element of the RESTATEMENT (SECOND) OF TORTS § 388 (1965). Comment n, which has been determined to be included in the law of Virginia, *see Barnes v. Litton Indus. Products, Inc.*, 555 F.2d 1184, 1188 (4th Cir.1977), delineates various factors that must be balanced in determining what precautions the supplier of the product must take to satisfy the clause (c) requirement of reasonable care. These include: (1) the dangerous condition of the product; (2) the purpose for which the product is used; (3) the form of any warnings given; (4) the reliability of the third party as a conduit of necessary information about the product; (5) the magnitude of the risk involved; and (6) the burdens imposed on the supplier by requiring that he directly warn all users. This comment recognizes that a balancing of these considerations is necessary in light of the fact that no single set of rules could possibly be advanced that would automatically cover all situations. Critical in my view is the recognition that "[m]odern life would be intolerable unless one were permitted to rely to a certain extent on others doing what they normally do, particularly if it is their duty to do so." *Id.* at 308.

Next, I address the case law cited by Plaintiffs, all of which I find to be distinguishable from the case before the Court. Their principal authority, *Dougherty v. Hooker Chemical Corp.*, 540 F.2d 174 (3rd Cir.1976), a diversity case applying Pennsylvania law, did not even deal with the issue presented here, namely whether the supplier had a duty to warn the users in the first place.[6] Instead, it was tried solely on the issue of the adequacy of the warnings which were given by the supplier.

There, the widow of a helicopter transmission builder sued the Hooker Chemical Corporation ("Hooker") which supplied to the deceased's employer, Boeing Vertol Company ("Boeing"), the chemical solvent trichloroethylene ("TRI"). The employee's cause of death was believed to be TRI poisoning, a possibility that was not mentioned in either the warnings given by Hooker on the 55 gallon drums of TRI or in its safety data sheets supplied to Boeing. Boeing, however, possessed additional in-

---

**5.** Much of Defendants' argument focuses upon clause (b) of § 388, but I feel the more pertinent inquiry should be the reasonableness standard of clause (c).

**6.** Defendants criticize the *Dougherty* decision by saying that it was decided on a strict liability theory. This is just not so. The panel majority explicitly stated that it was basing its decision on § 388 and negligence law, not strict liability. 540 F.2d at 178.

Another panel of the Third Circuit, on the other hand, has held that where a foreman possesses adequate information about the dangers associated with premature explosion of dynamite placed in a freshly drilled hole and an employee working under the foreman was injured by such an accident, the dynamite manufacturer was not negligent in failing to warn the injured employee about this hazard. *See Hopkins v. E.I. DuPont De Nemours & Co.*, 212 F.2d 623 (3rd Cir.), *cert. denied,* 348 U.S. 872, 75 S.Ct. 108, 99 L.Ed. 686 (1954).

formation not obtained from Hooker that discussed possible death from TRI poisoning.

At the close of the plaintiff's evidence, the district court granted a directed verdict in Hooker's favor, holding as a matter of law that its warnings were adequate and that in any event Boeing possessed independent knowledge of the possible dangers of prolonged TRI inhalation. In reversing, the divided panel of the Third Circuit held that there was sufficient evidence to create a triable jury issue on the adequacy of warnings. Especially significant in majority's reasoning is its conclusion that on the evidence presented "a jury could reasonably find ... that there was no reasonable basis for Hooker to rely on Boeing's independent knowledge of the fatal properties of TRI ... [or] ... upon Boeing giving appropriate information to its employees of all the hazards of working with TRI." 540 F.2d at 181–182. In contrast, I find that in the instant controversy reasonable men could not differ on whether the Lynchburg Foundry: (1) was a knowledgeable industrial purchaser of silica sand and related products; (2) had intimate knowledge of the dangerous properties of silica products since at least the 1950s; and (3) had every reason to try to protect its employees from these hazards by communicating to them information on harmful properties of silica.

In *Neal v. Carey Canadian Mines, Ltd.,* 548 F.Supp. 357 (E.D.Penn.1982), another diversity action applying Pennsylvania law, former employees of an asbestos insulating manufacturer, their spouses and representatives sued their former employer and asbestos suppliers. Their claims were predicated on strict liability and negligence under *Restatement* §§ 402A and 388, respectively. Under the strict liability theory, the court, relying on a Pennsylvania state decision, held that the supplier defendants of an inherently dangerous product like asbestos had a non-delegable duty to provide adequate warnings that will reach the ultimate user.

In its § 388 negligence analysis, the court cites *Dougherty, supra,* for the prop-osition that the suppliers owed a duty to warn of asbestos exposure hazards since the plaintiffs were the ultimate users of the asbestos products. Then, without analyzing whether the supplier could reasonably rely upon the employer to inform the employees of the dangers related to asbestos as called for under clause (c) of § 388, and, more importantly, comment n, the district court simply denied the suppliers' motion for judgment N.O.V. "because of the supplier defendants' *non-delegable* duty to warn users of asbestos fiber of the hazards associated with exposure to asbestos fiber." 548 F.Supp. at 369 (Emphasis added.). This, in my opinion, is a totally unwarranted construction of § 388 and, for that matter, the Third Circuit's opinion in *Dougherty.* Despite what the *Neal* court may posit, *Dougherty* did not hold that under a negligence theory the duty to warn is non-delegable. If that were true, then the third prong of § 388 and the balancing of considerations outlined in comment n would simply be rendered meaningless. *Neal* may be correct that the duty to warn is non-delegable under Pennsylvania's strict liability doctrine, but it simply does not hold true as to the § 388 duty to warn requirements on a negligence claim.

A worker employed by Mennen-Greatbatch Electronics ("Mennen") suffered a severe chemical burn to her face when, after spilling a caustic resin on her hand, she brushed perspiration from her face with the hand in *Billiar v. Minnesota Mining and Mfg. Co.,* 623 F.2d 240 (2nd Cir. 1980). She brought an action against Minnesota Mining and Mfg. Co. ("3M"), the manufacturer of the resin, for its negligent failure to warn her adequately of the chemical's dangers. In turn, 3M impleaded Mennen for failing to provide a safe work place. The Second Circuit, applying New York law, affirmed the Plaintiff's verdict against 3M and the jury's allocation of some fault to Mennen.

The case contrasts significantly with the cases at hand because it involved the issue of whether the plaintiff herself, not her employer, was a knowledgeable user and,

therefore, whether 3M owed her a duty to be warned of the product's dangers. 3M, unlike the Defendant suppliers here, did not raise any defense that it was insulated from directly warning the plaintiff due to her employer's equal or superior knowledge about the dangers of the 3M resin. For this reason, the *Billiar* court's discussion of whether there was sufficient evidence in the record to support 3M's third-party recovery against Mennen that Plaintiffs quote in their initial brief at p. 44 is taken totally out of context.

*Jackson v. Coast Paint and Lacquer Company,* 499 F.2d 809 (9th Cir.1974), an action by a painter against the paint manufacturer for personal injury which he claimed resulted from inadequate warnings, was presented on a strict liability theory based on the *Restatement* § 402A. Since the case involves a theory which has not been accepted in Virginia, it has no application to our cases.[7]

In *Jones v. Meat Packers Equipment Co.,* 723 F.2d 370 (4th Cir.1983), a worker in a meat packing plant who was cleaning a meat mixer-blender lost part of her hand when the machine suddenly activated. The case actually turned on whether the issue of worker's contributory negligence should have been submitted to the jury. Deciding that there was no evidence to support the submission of this issue to a jury, in light of the fact that the manufacturer never advised either the employer or the workers that the machine would self-activate, the judgment in favor of the manufacturer was vacated and the case remanded for a new trial.

In *dicta,* the *Jones* court generally discussed the other assignments of error, including the manufacturer's duty to warn under § 388. Since the machine there was defective as manufactured and since the

manufacturer had previously been appraised of this malfunction problem on at least one occasion, it became the manufacturer's duty to warn about this defect. *Having found that duty to warn existed,* the court, relying upon the guidance provided by comment n to § 388, then went on to state that the adequacy of any warnings given may be evaluated by a jury. Moreover, the question of whether the manufacturer can reasonably rely upon the employer to warn his employees who used the machine about its damages was also held to be a factual issue within the province of a jury.

■ Turning to Defendants' authority, they maintain that in Virginia there is no duty on product suppliers to warn employees of knowledgeable industrial purchasers as to product-related hazards. I agree.

In *Marker v. Universal Oil Products Company,* 250 F.2d 603 (10th Cir.1957), an oil company employee was asphyxiated by carbon monoxide gas when he was lowered into a petroleum refining vessel constructed by his employer pursuant to a design furnished by Universal Oil Products Company ("Universal"), who had also supplied the catalyst used in the vessel. The employee's beneficiary sued Universal, alleging that it was negligent in failing to warn the decedent of the danger of entering the vessel in which the chemical had been placed.

The Tenth Circuit affirmed the lower court's directed verdict for Universal, holding that since this danger was equally within the technical knowledge of decedent's employer and Universal, no duty existed upon Universal to warn. *Id.* at 606. Instructive in this regard is court's conclusion that Universal had a right to rely upon the employer to protect his employees from harm and that Universal should not be

---

**7.** As an interesting aside, the court in *Jackson* compares the facts presented with two cases relied upon by Defendants here, *Hopkins v. E.I. DuPont de Nemours & Co., supra,* and *Jacobson v. Colorado Fuel & Iron Corp.,* 409 F.2d 1263 (9th Cir.1969). One of its important distinctions between the cases was that paint, unlike the dynamite in *Hopkins* and steel strands in *Jacob-* son, "is a product so dispensed that warnings to the ultimate consumer can readily be given." 499 F.2d at 813–814. As Defendants correctly point out, the sand in these cases arrives at the Foundry in large railroad car lots, not in smaller containers or packages upon which warnings can easily be attached.

liable under § 388 even though employer never conveyed to its employees vital information about the product in question. *Id.* at 607.

In *Littlehale v. E.I. DuPont De Nemours & Co.*, 268 F.Supp. 791 (S.D.N.Y. 1966), *aff'd,* 380 F.2d 274 (2nd Cir.1967), the plaintiffs had been injured when blasting caps manufactured by DuPont exploded while they were working for the Navy. They alleged that DuPont was negligent in failing to provide adequate warnings on the dangers involved in use of these blasting caps. Summary judgment was granted in DuPont's favor by the district court which held that no duty to warn the plaintiffs existed because there is no duty to give warnings to members of a profession as to generally known risks. *Id.* at 798. Furthermore, when the manufacturer owes no duty of warning to the purchaser who is well aware of inherent dangers of a product, there is no such duty running to the employees of the purchaser either. *Id.* at 799.

An employee of a Reynolds Metal Company subcontractor who was injured when he was struck in the head by an overhead crane sued the crane manufacturer in *Spangler v. Kranco, Inc.*, 481 F.2d 373 (4th Cir.1973). The manufacturer was not liable for the alleged negligent failure to warn under § 388 there since the reasonable need for safety features depended upon the particular working environment involved, responsibility for warnings was placed upon Reynolds. Assuming any warning device was called for, the court reasoned that such danger was open and obvious to Reynolds *and its personnel.* Accordingly, the case was determined to fall outside the purview of § 388. *Id.* at 375.

On alternate reasoning, the court concluded that where the manufacturer relied upon Reynolds' industrial expertise, plans and specifications, and especially since nei-

ther the National Safety Code nor the Occupational Health & Safety Act required any warning mechanism, the crane manufacturer acted reasonably in relying on Reynolds. *Id.* One of the cases cited for this position was *Littlehale, supra.*

Almost seven years later, the Fourth Circuit returned to the duty to warn issue in *Marshall v. H.K. Ferguson Co.*, 623 F.2d 882 (4th Cir.1980). In *Marshall,* an Anheuser-Busch brewery employee was severely burned by the emission of steam, hot water and hops from a spent hops conveyor when he opened the machine for cleaning. He brought suit against the manufacturer of the machine as well as the designer of the brewery, claiming three theories: unreasonably dangerous product, defective design, and breach of a duty to warn.

Judgments entered for both defendants were affirmed by the appellate court because of its conclusion that the plaintiff's injuries "resulted *solely* from the conduct of the employees of Anheuser-Busch ..." *Id.* at 887 (Emphasis supplied). As I read *Marshall,* this holding of the panel majority is predicated upon its finding that the injury was not caused by any defect in the product itself, but instead the result of procedures employed by the Anheuser-Busch personnel in attempting to relieve the clog in the conveyor system. Nevertheless, the discussion of duty to warn indicates that the Fourth Circuit still approves of the principle enunciated in the *Universal, Littlehale,* and *Spangler* decisions that where an employer is knowledgeable as to the dangers or defective conditions with a product, the supplier can reasonably rely upon the employer to protect his employees from any harm.[8]

Thus, these cases cited by Defendants stand for the proposition that in alleged negligent failure to warn situations such as this litigation, if the danger related to the particular product is clearly known to the

---

8. In other words, although the pertinent language dealing with the duty to warn claim supports Defendants' overall position, their reliance on the actual holding of *Marshall* is misplaced. It is questionable that the holding of that case stands for the proposition that the knowledge of the purchaser negates any obligation on the supplier to warn of product defects or dangers in light of the court's specific finding that the product was neither defective nor dangerous.

purchaser/employer, then there will be no obligation to warn placed upon the supplier. Instead, it becomes the employer's responsibility to guard against the known danger by either warning its employees or otherwise providing the necessary protection. Stated another way, when the supplier has reason to believe that the purchaser of the product will recognize the dangers associated with the product, no warnings are mandated.

Plaintiffs try to distinguish *Spangler* and *Marshall* from this litigation by directing my attention to three other Fourth Circuit decisions, *Barnes v. Litton Indus. Products, Inc., supra, Gardner v. Q.H.S., Inc.,* 448 F.2d 238 (4th Cir.1971), and *Spruill v. Boyle-Midway, Inc.,* 308 F.2d 79 (4th Cir.1962). Each of these cases involved *consumer* products, i.e. burning alcohol, hair rollers, and furniture polish respectively, that were determined to be inherently dangerous and the dangers there were neither obvious nor known to the user.

■ I find this argument, as well as Plaintiffs' contention that the silica-related hazards are latent, to be without merit for two reasons. First, as contrasted with these three consumer product cases, here we have an industrial product and, more importantly, a knowledgeable, sophisticated employer who supplies it for use to its employees. Second, the latent/patent distinction has no place in this litigation in light of Defendants' concession for argument purposes that Plaintiffs did not know of the dangers of silicosis and the evidence clearly shows that the inherent dangers of silica was not latent insofar as the Foundry is concerned.

Plaintiffs also submit that Defendants should not be allowed to now argue that the Foundry was a knowledgeable user because until the initiation of these suits the Defendant suppliers made no effort to attempt to determine the extent of the Foundry's knowledge about silicosis. I find this to be of no consequence here because even without making any actual inquiry, the Defendant suppliers could reasonably assume that the Foundry had substantial expertise in this area and that it would perform its legal obligations as well as protecting its own financial interest.

Plaintiffs further attempt to distinguish these knowledgeable user situations from the cases at bar by pointing out that in each instance the employer participated in the selection, design, and manufacture of the particular product. While I would agree that in such cases one would certainly be hard-pressed to contend that the employer lacked knowledge of the hazards involved with the product, I do not feel that the absence of this fact is fatal to the overall holdings of these decisions. From my reading of these cases, it is all a matter of degree with the critical inquiry being whether the employer possessed knowledge of the dangers. When there has not been this direct contribution on the part of the purchaser/employer in the production of the chattel, one must concentrate on what, if anything, the employer knew in terms of the chattel. Accordingly, I now focus on the knowledge of the Lynchburg Foundry.

### B.

From my review of the various appendices, affidavits, depositions, and exhibits submitted by the parties, I find that a plethora of material[9] exists on the Lynchburg Foundry's extensive knowledge of the hazards of inhaling silica dust, the disease of silicosis, and proper dust control methods. It clearly shows that the Foundry is a

---

**9.** As Defendants have recently brought to my attention, in *Urie v. Thompson,* 337 U.S. 163, 179, 69 S.Ct. 1018, 1029, 93 L.Ed. 1282 (1949), a case including the question of whether injuries incurred by contracting the occupational disease of silicosis were recoverable under the Federal Employer's Liability Act and the Boiler Inspection Act, the United States Supreme Court quoted with approval the following statement of the New York Court of Appeals:

> It is a matter of common knowledge that it is injurious to the lungs and dangerous to health to work in silica dust, a fact which defendant was bound to know.

*Sadowski v. Long Island R. Co.,* 292 N.Y. 448, 455–456, 55 N.E.2d 497, 500–501 (N.Y.1944).

knowledgeable employer within a knowledgeable industry.

As pointed out by H. Donald McVey, the Foundry's safety director from 1974 through 1983, the foundry industry's knowledge about silicosis can be traced to the early 1930s. This is evident from the official proceedings of the American Foundrymen's Society ("AFS"), which is an international technical organization comprised of individuals and businesses that is dedicated to the creation and dissemination of technical information related to the foundry industry. This society has served in no small measure as a repository for and disseminator to the foundries of technical know-how on the subject of silicosis. For example, at the 1935 annual meeting the AFS members in attendance extensively dealt with such subjects as industrial health hazards and dust collection in the foundry. The next year's meeting included discussion of the overall progress of safety and hygiene in the foundry on the medical and legislative fronts.

A cursory reading of the AFS proceedings for these two years reveals that the foundry industry possessed intimate knowledge of silicosis and had developed methods to attempt to control the problem of silica dust since at least the mid-1930s. In fact, the 1936 AFS transactions, in their concise chronology of the history of the foundry industry's knowledge of the silicosis problem from 1871, point out that the dangers of silicosis had been commonly known for some time prior to that date.

This insight must be imputed to the Foundry through its Vice President, Max Kuniansky, who took an active part in the affairs of the AFS. Kuniansky attended the 1935 and 1949 AFS annual meetings. In 1949, he presided as past chairman of the Society. At that meeting, Defendants' expert, George E. Tubich, an industrial hygiene engineer active in the foundry industry since 1941, presented a paper, which once again dealt with the subject of silicosis.

In his detailed affidavit, Tubich states that the problems of silicosis within the foundry industry have been commonly known within the field of industrial hygiene since the early 1900s; that by the later 1930s, discussions and writings in the field of industrial hygiene, the foundry industry, and the medical profession made the disease one of the most widely known occupational diseases; that in 1935, it was well recognized in the foundry industry that "good housekeeping" procedures were imperative to reduce or prevent the incidence of silicosis; that by at least 1935 the sources of silica exposure had been clearly identified and engineering controls and procedures were recognized throughout the industry; and that many foundries had begun silicosis control programs. These programs included periodic medical reviews, including x-rays of employees who worked in areas of high silica concentration, distribution of information to employees covering the disease of silicosis, periodic and regular monitoring of silica dust concentration in the atmosphere, and the distribution of respirators to employees.

In Virginia, the General Assembly passed a statute in 1914 compelling foundries to provide adequate ventilation for removal of harmful dust. Va.Code § 1833 (1914). This section stated that the foundries "must be ventilated in such a manner as to disburse ... [the] dust ... and render [it] harmless" and provided that Virginia's Department of Labor would monitor proper compliance.

The record is also replete on the issue of the Lynchburg Foundry's knowledge about silicosis. It is confirmed in the Supreme Court of Virginia cases of *Metropolitan Life Insurance Co. v. Krupel*, 165 Va. 602, 183 S.E. 241 (1936) and *Lewis v. Lynchburg Foundry*, 204 Va. 303, 130 S.E.2d 429 (1963) as well as Industrial Commission of Virginia's reported decision of *Gray v. Lynchburg Foundry Corporation*, 44 I.C. 105 (1962).

Larson Wile, the Foundry's metallurgist and sand technologist from 1951 through 1981, who served as the primary liaison between the Foundry and the sand suppliers and has been an active member in the

AFS since 1947, has stated that he too was aware of the causal relationship between improper handling of silica sand and silicosis and would have considered warning by the sand suppliers as unnecessary.

The Foundry's ongoing knowledge is evident in the deposition of its former safety director, H. Donald McVey, who, when asked whether he personally made any inquiry of the Defendant suppliers as to the dangers of the silica dust, stated:

> I did not make any such investigation because I had made the assumption long before, *since as far back as the last '30's, we had been faced with problems of dust and silicosis, that there was an ongoing knowledge,* and through the work that had been done with our industrial hygienist and the working relationships that our First Aid people had, via the x-ray program, the pulmonary function program, there was sufficient knowledge there to handle any type of questions dealing with silica and its compounds.

McVey deposition at 82, Defendants' Appendix at 192. (Emphasis added.)

In November of 1955, an occupational health study was done at the Foundry by the engineering department of the Employers Liability Assurance Corporation ("ELAC"), Foundry's insurer. This study demonstrates a full comprehension by the Foundry of the dangers of high silica dust concentration and silicosis.

Theodore G. Offterdinger, who began work at the Foundry in 1941, was a personnel assistant there from 1947 to 1951, the safety director from 1951–1954, and later an assistant personnel director with the supervision over the safety director. He testified that when he first came to work for the Foundry in 1941, the danger of silicosis was known at the Foundry and that every effort was made to communicate to the workers the information in the 1955 report, namely that the breathing of free silica without proper protection can cause the disabling lung disease of silicosis.[10] Offterdinger adds that in the early 1950s, he learned that the increased mechanization at the Foundry tended to increase the breakdown of sand particles more so than the earlier hand operation, thereby causing higher incidence of silicosis in the Foundry workers.

John William Jones, one of the members of the 1958 ELAC survey team, succeeded Offterdinger as safety director in the mid-1950s. He too dealt extensively with the silica dust problem at the Foundry throughout the 1950s and 1960s. He says that he kept abreast of the problems of silica dust exposure by reading, attending conventions, and obtaining the monthly inspection reports of the ELAC. Jones emphatically states that there was no question in his mind that during the later 1950s and early 1960s the workers were advised about the dangers of silica dust exposure and the need to use respirators. Although he cannot recall whether this was done through written communication, he says that the information was conveyed to the workers verbally at safety meetings and in individual one-on-one contacts.

Exhibit #10 to Jones' deposition is a document that contains the minutes of a meeting on January 23, 1959, involving a discussion of the dangers of silicosis by the Foundry's management and representatives of the worker's compensation carrier. It is a further illustration of the Foundry's awareness of this danger.

A 1977 capital project request for a mobile x-ray unit to provide chest x-rays for employees documents the Foundry's early experience in dealing with the hazards of silicosis and its numerous worker's compensation claims:

> Silicosis is an incurable and possibly disabling respiratory ailment caused by continued exposure to silica dust. In 1959, it was found that several employees had developed the disease while working in the foundry environment.

---

**10.** In view of Defendants' concession that the Plaintiffs' were not aware of the dangers of silica, we are not concerned with the effectiveness of the Foundry's effort to communicate this information, but only with the fact that it had knowledge of the information.

Consequently a respirator program was initiated. Even still other silicosis cases have been and continue to be diagnosed, with the most recent case occurring in early 1977.

In addition to the respirator program, an annual x-ray program was started to provide early detection of silicosis cases. These services were contracted from the State of Virginia's Mobile X-ray Unit up until 1974 when the State discontinued its use. Since that time each of LFC's three plants have contracted x-ray services from local clinics and laboratories.

It is estimated that LFC can realize an annual savings of $14,500 by purchasing and operating a mobile x-ray trailer... In addition to the ... cost savings, employee relations will be improved by operating a mobile x-ray unit.

McVey Exhibit 79, Defendants' Appendix at 93.

According to Robert C. Staton, a Foundry employee for almost 28 years and the current manager of the Special Foundry at the Lower Basin facility, airline respirators have been in continuous use at the Lower Basin since around 1955.

Dr. William L. Barney served as director of the Chest Clinic at the Lynchburg City Health Department. Beginning around 1961, Barney, the only physician in the Lynchburg area with any training in the field of pulmonary diseases, was approached by the Foundry's Theodore G. Offterdinger for assistance with its silicosis problem. Prior to this initial contact with the Foundry, Barney estimates that he had only seen a few Foundry employees on a private basis. When approached by the Foundry for help, Barney understood that the Foundry knew that a silicosis problem existed and had, as a result, installed airline respirators, together with equipment for monitoring silica dust concentration. The Foundry also had an existing x-ray program for medical evaluation of the workers. Still, the Foundry was seeking Barney's advice on what to do with those employees who had been heavily exposed to silica dust prior to its recent remedial measures.

According to Barney, he saw his new mission in the "silicosis program" as being two-fold. First, he had to determine those Foundry employees whose positive x-rays suggested silicosis. There were approximately 40 such workers. Three of these were sent to the University of Virginia hospital for lung biopsies which all came back positive for silicosis. Second, the doctor had to monitor the workers who did not have positive x-rays, but had also been exposed to known areas of dust concentration at the Foundry such as the grinding and shake-out sections. He estimated this group to be 140 in number.

These 180 "at-risk" employees were then selected for full size periodic x-ray studies and follow-up medical examinations where indicated. Over the years, additional Foundry workers were added to the program. Of the 91 original Plaintiffs in this action, 31 participated in the monitoring program, which continues to this date. In view of the number of workers with silicosis, Barney concluded that a significant silicosis problem existed at the Foundry. In spite of this, he was repeatedly assured by Foundry personnel that the necessary measures had been taken to clear up the dust problem at the Foundry.

Barney continued to diagnose cases of silicosis at the Foundry throughout the 1960s, as is illustrated by his letter to Offterdinger dated September 20, 1967, where he notes the appearance of silicosis in an employee named Arthur Cox[11] who had been in the silicosis program since 1962. In this letter, Barney states that Cox should either be placed at a job where he can wear an airline respirator or else be removed from the dangerous area.

As safety director from 1974–1983, H. Donald McVey was the individual in charge of safety and health programming at the

---

**11.** As previously noted, *see supra* n. 2, Defendants' Second Motion for Summary Judgment was granted as to ten Plaintiffs who had not filed their actions within Virginia's two-year limitations period, one of which was Arthur Cox.

Foundry. When he began work as an industrial engineer in 1968, there was extensive dust control equipment and two different types of respirators always in use at the Lower Basin plant. McVey testified that during this period he was fully informed about the dangers of silica dust within the Foundry and recent developments in this area. There were safety managers at each plant who assisted him in maintaining proper environmental conditions at these plants. At McVey's direction, the Foundry made numerous modifications to its dust control equipment and installed substantial amounts of new equipment to control and eliminate silica dust from the Lower Basin plant. He estimates that the Foundry expended one million dollars in its ongoing efforts to control silica dust at the Lower Basin between 1974 and 1983. McVey felt that, on the whole, the Foundry, with its competent engineering department, industrial hygienist, and medical staff was more knowledgeable about its own internal production processes and equipment than most outsiders would be. For this reason, McVey did not feel it was necessary for the Foundry to make any further inquiries with the Defendant suppliers.

In the early 1970s, McVey was responsible for bringing the Foundry in compliance with the dust control standards set forth under the newly enacted Occupational Safety and Health Act, 29 U.S.C. § 651–678 (1975 and Supp.1984) (the "Act"). This law, passed in 1970, set up the Occupational Safety and Health Administration ("OSHA") which issued various regulations pertaining to permissible dust exposure levels and respirator protection programs. McVey testifies that he was knowledgeable concerning both the standards set forth under the Act, and, in particular, the specific regulations relating to permissible levels of exposure to silica dust.

As the result of an OSHA inspection made in October of 1973, the Foundry was cited on March 12, 1974, for excess silica dust exposure at Shed # 2 of the Lower Basin Special Foundry. Pursuant to OSHA regulations, this citation was posted on the bulletin board at the main entrance to the Lower Basin Plant and in the cleaning shed. The Foundry worked extensively with OSHA to eliminate this violation. In its efforts to resolve the problem, the remedial measures included employment of an industrial hygienist to make dust counts, adoption of a respirator protection program in compliance with OSHA standards, and requirements that Foundry employees in areas of high dust exposure to wear respirators until the dust problem could be solved from an emergency standpoint. Finally, the Foundry and its workmen's compensation insurance carriers performed countless studies and surveys to determine employee exposure, excess silica dust levels, and various ways to alleviate these conditions.

The affidavits of Plaintiffs' three experts, Robert C. Creese, David A. Fraser, and Gerrit W.H. Schepers, were submitted to highlight the Foundry's lack of sophistication with respect to its silicosis problem. These all follow the same pattern in that they review the depositions of Dr. Barney and key Foundry personnel such as McVey, Staton, and James D. Childress. Next, they point out the information available to the Foundry in this area and criticize the Foundry's lack of proper corrective measures. Then, the experts conclude that because of this inaction, the Foundry did not have the proper sophistication in dealing with silicosis. I find this conclusion to be nothing short of amazing. Their affidavits clearly do nothing to rebut the facts set forth by Defendants and demonstrate that the Foundry had available to it information about silica dust exposure and silicosis. This, in turn, reinforces defense argument that since the Foundry had such insight, Defendants could assume that proper use would be made thereof.

Thus, in light of the above, it is well-established that the Lynchburg Foundry was cognizant of the problems of silica dust and silicosis since at least the 1930s. More importantly, from the late 1950s and early 1960s onward, the Foundry's knowledge was nothing less than extensive.

### C.

■ Touching briefly on another point raised by Defendants, I agree that a sand supplier to a large, knowledgeable foundry like the Lynchburg Foundry has no duty to warn the foundry employees about the occupational disease of silicosis and its causes when only the Foundry is in a position to communicate effective warning and accordingly should be the one to shoulder any burden of effective warning. The difficulties that the sand suppliers face in attempting to warn the Foundry's employees of the hazards inherent in the use of sand in a foundry setting are numerous.[12] These include (1) the identification of the users or those exposed to its products would require a constant monitoring by the suppliers in view of the constant turnover of the Foundry's large work force; (2) the manner in which the sand products are delivered in bulk (i.e. unpackaged railroad car lots or truck); (3) no written product warnings placed on the railroad cars would ever reach the workers involved in casting or those in the immediate vicinity due to the way the loose sand is unloaded, conveyed, and kept in storage bins until needed; (4) only the Foundry itself would be in a position to provide the good housekeeping measures, training and warnings to its workers on a continuous and systematic basis necessary to reduce the risk of silico-

sis; (5) the sand suppliers must rely on the Foundry to convey any safety information to its employees; (6) the confusion arising when twelve different suppliers and the Foundry each try to cope with the awesome task of instructing the Foundry workers; and (7) in a commercial setting, it would be totally unrealistic to assume that the suppliers would be able to exert pressure on a large, industrial customer such as the Foundry to allow the suppliers to come in and educate its workers about the hazards of silicosis. *See e.g. Reed v. Pennwalt Corp.*, 22 Wash.App. 718, 591 P.2d 478 (Wash.Ct.App.1979); Schwartz and Driver, *Warnings In The Workplace: The Need For A Synthesis Of Law And Communication Theory*, 52 U.Cin.L.Rev. 38 (1983).

In addition, the responsibility of providing a safe workplace and giving warnings of employment-related dangers should be borne by the Foundry for still another reason:

> The extension of workplace warnings liability unguided by practical consideration has the unreasonable potential to impose absolute liability in those situations where it is impossible for the manufacturer to warn the product user directly. In the workplace setting, the product manufacturer often cannot communicate the necessary safety information to prod-

---

12. I find the testimony of representatives of the different sand suppliers that is contained in Plaintiffs' appendix to be most instructive here. They universally indicate that due to the membership and active participation of Foundry representatives in the AFS, the suppliers felt that the Foundry certainly possessed knowledge of the hazards of respirable free silica. Accordingly, no further investigation into either the knowhow of the Foundry or its workers was undertaken. Likewise, no warning labels were placed on their invoices or the rail cars and truck in which their products were delivered. For example, David Hergert of Defendant Whitehead Brothers has surmised that the Foundry was knowledgeable as a result of the fact that it requested material safety data sheets in 1974. John R. Salt of Defendant Manley Brothers explains that its material safety data sheets and handling instructions were available upon request.

Like the Foundry, the Defendants typically had possessed knowledge of the dangers of

workers inhaling respirable free silica for some time and took various steps to protect their own workers.

The deposition testimony of John R. Salt of Defendant Manley Brothers is especially helpful because he discusses the problem of Manley Brothers attempting to implement the type of training program for foundry workers that Plaintiffs ask for. Salt states that he did not feel this was the suppliers' responsibility; that he knows of no foundry that would even countenance the concept of the sand suppliers coming into the foundries and training the workers; and that this was impractical in view of the large number of foundries involved and their constantly changing work force. He testified that since both the Foundry and the sand supplier companies were all involved in the handling of silica and had access to various information about the hazards of silica sand dust, that it was reasonable on the suppliers' part to assume that the Foundry had an adequate background in this area.

uct users in a manner that will result in reduction of risk. Only the employer is in a position to ensure workplace safety by training, supervision and use of proper safety equipment. Designating the manufacturer an absolute insurer of its product removes the economic incentives that encourage employers to protect the safety of their employees.

Schwartz and Driver, *supra*, at 43. (Footnotes omitted.)

## II.

■ Next, I deal with the legal effect of the Foundry's extensive knowledge about the danger of exposure to silica dust upon Plaintiffs' breach of implied warranty of merchantability. Virginia Code § 8.2–314. This warranty arises, if at all, at the time the product is sold to the purchaser. *Bly v. Otis Elevator Co.*, 713 F.2d 1040 (4th Cir.1983). It runs from the seller to the purchaser and then through the purchaser to the ultimate user. With one notable exception,[13] the user can rise no higher than purchaser through which he obtained the implied warranty. *Fischbach & Moore Intern. v. Crane Barge R–14*, 632 F.2d 1123 (4th Cir.1980). Thus, one must examine whether an implied warranty of merchantability was created when the Defendant suppliers sold the silica sand and related products to the Foundry.

As has already been demonstrated above in the discussion of the negligence claim, the Foundry has had extensive knowledge of the presence of silica in the different products purchased from Defendants and the harmful effects of respirable free silica dust for many years. The dispositive question, therefore, is whether a purchaser who has full knowledge of a defect or dangerous condition of a product receives an implied warranty of merchantability from the seller that such conditions do not exist.

■ When a skilled purchaser such as the Lynchburg Foundry knows or reasonably should be expected to know of the dangerous propensities or characteristics of a product, no implied warranty of merchantability arises. *See generally* 3 R. Anderson, UNIFORM COMMERCIAL CODE § 2–314:79 (1979); W. Kimble and R. Lesher, PRODUCTS LIABILITY § 196 (1979), citing *Littlehale v. E.I. DuPont DeNemours & Co., supra.* Since Plaintiffs claim derivatively through the Foundry on their implied warranty claim, and since the Foundry received no implied warranty as to the particular harmful propensities and characteristics of free silica because of their extensive knowledge in this area, Plaintiffs' claim on this theory must also fail.

In conclusion, having determined that there remains no genuine issue of material fact and that Defendants are clearly entitled to judgment as a matter of law on Plaintiffs' remaining negligence and warranty claims, summary judgment will be entered in Defendants' favor.

An appropriate order will issue.

## ORDER

For the reasons set forth in the accompanying Memorandum Opinion, it is ADJUDGED and ORDERED as follows:

1. The Joint Motions for Summary Judgment on the duty to warn issue filed by Defendants Manley Brothers; Pennsylvania Glass Sand Corporation; Foseco, Inc.; Hardy Sand Company; Warner Company; Whitehead Brothers Company; American Colloid Company; Babcock & Wilcox Company; C.E. Minerals; Fireline, Inc.; McIntyre Enterprises, Inc.; and Thomas H. Hardy, individually and trading as Hardy Sand Company shall be, and they hereby are, GRANTED.

2. These cases shall be, and they hereby are, DISMISSED and STRICKEN from the active docket of this Court.

3. The remaining questions of attorneys' fees and other expenses claimed, being a collateral matter which does not keep

---

**13.** Limitation of damages in personal injury cases is prima facie unconscionable. Va.Code § 8.2–719; *Matthews v. Ford Motor Company,* 479 F.2d 399 (4th Cir.1973).

this Order from being final, is deferred until a later date.

The Clerk is directed to send certified copies of this Order and the accompanying Memorandum Opinion to all counsel of record.