**David H. SMITH and Louise Smith, his wife, Plaintiffs,**

v.

**WALTER C. BEST, INC., a corporation, Pennsylvania Glass Sand Corporation, a corporation, Defendants,**

v.

**MANLEY BROTHERS, Keener Sand and Clay Company, and Whitehead Brothers, Third–Party Defendants.**

**David H. SMITH and Louise Smith, his wife, Plaintiffs,**

v.

**WHITEHEAD BROTHERS, INC., Defendant.**

**David H. SMITH and Louise Smith, his wife, Plaintiffs,**

v.

**MANLEY BROTHERS, Defendant.**

Civ. A. Nos. 85–2366, 87–497 and 87–611.

United States District Court, W.D. Pennsylvania.

Jan. 18, 1990.

Thomas W. Henderson, Thomas White, Henderson & Goldberg, P.C., Richard J. Federowicz, Weis & Weis, Pittsburgh, Pa., for David H. and Louise Smith.

Louis Anstandig, Anstandig Levicoff & McDyer, Joseph S.D. Christoff, II, J.W. Montgomery, III, P. Brennan Hart, Zimmer, Kunz, Loughren & Hart, Pittsburgh, Pa., for Walter C. Best, Inc. and Pennsylvania Glass Sand Corp.

P. Brennan Hart, Zimmer Kunz Loughren & Hart, Pittsburgh, Pa., for Whitehead Bros., Inc.

William M. Wycoff, Julie A. Maloney, Thorp Reed and Armstrong, Pittsburgh, Pa., for Manley Bros.

## MEMORANDUM OPINION

MENCER, District Judge.

This action was brought by the plaintiffs, David H. Smith and his wife, Louise Smith, seeking compensatory and punitive damages for injuries sustained by Mr. Smith as a result of exposure to silica sand allegedly sold by the defendants, Walter C. Best, Inc., Pennsylvania Glass Sand Corporation and Combustion Engineering, Inc., and third-party defendants, Manley Brothers, Negley Fire Clay Company, Magneco Metrel, Inc., American Colloid, and Cedar Heights Clay Company, to Mr. Smith's employer, the Valley Mould and Iron Company. Jurisdiction in this case is grounded in diversity pursuant to 28 U.S.C. § 1332. Upon stipulation of the parties, this action was dismissed with prejudice as to Combustion Engineering only on July 16, 1986. On January 7, 1987, third-party defendant Negley Fire Clay Company was also dismissed from this action for failure to make service within 120 days of the complaint's filing. Motions for summary judgment were subsequently filed by third-party defendants Magneco Metrel, Inc., Keener Sand and Clay, American Colloid, and Cedar Heights Clay Company, and granted for Magneco Metrel, Inc. on September 8, 1987, for American Colloid on September 10, 1987 and for Cedar Heights on October 22, 1987. The instant matter is now before the court by motion of Pennsylvania Glass Sand Corporation on behalf of itself, remaining defendant Walter C. Best., Inc., and third-party defendants Manley Brothers, Keener Sand and Clay Company, and Whitehead Brothers for summary judgment pursuant to Rule 56 of the Federal Rules of Civil Procedure.

### I.

The plaintiff, David H. Smith, was employed by the Valley Mould and Iron Company ("Valley Mould") in Hubbard, Ohio from 1956 until 1984. Valley Mould is engaged in the business of manufacturing cast iron molds used in the steel industry for casting ingots. Plaintiff's positions at the Valley Mould foundry included foundry laborer, caster, chainman, shake-out man and chipper. The complaint alleges that plaintiff's employment at Valley Mould subjected him to dusty conditions in the plant. Specifically, he alleges that he was exposed to sand and/or products containing silica or silica dioxide which was supplied by the defendants and that he inhaled silica dust which caused the condition of silicosis from which he now suffers.

Plaintiff and his wife brought this action seeking compensatory and punitive damages, alleging that defendants' conduct constitutes negligence and breach of warranty and renders them strictly liable under Section 402A of the Restatement (Second) of Torts because the defendants did not directly warn plaintiff of the risks associated with prolonged inhalation of silica dust.

Defendants contend that Ohio law is applicable to this action and that only an action in negligence, and not strict liability, arises from allegations of failure to warn under Ohio law. Defendants' motion for summary judgment is predicated on the

"knowledgeable purchaser" or "sophisticated user" defense. The defendants assert that there is no genuine issue of material fact that they were suppliers of sand to a knowledgeable purchaser, Valley Mould. Consequently, defendants maintain that they had no legal duty to warn plaintiff of the potential hazards of long term exposure to silica sand. Further, defendants assert that the Sixth Circuit has endorsed the "knowledgeable purchaser" defense under Ohio law.

In response, plaintiffs deny that Valley Mould was a knowledgeable purchaser, that Valley Mould had knowledge of any hazards associated with the inhalation of silica sand so as to vitiate the sand suppliers' duty to warn, and that plaintiff realized a specific risk involved by exposure to silica. Plaintiffs agree that the defendants relied upon Valley Mould to warn its employees, but maintain that the defendant suppliers nevertheless had a duty to warn the ultimate users of the risks involved with the use of the product.

## II.

■ We must initially determine which state's law is applicable to the substantive issues in this action. In addressing choice of law issues, a federal court exercising diversity jurisdiction must apply the choice of law doctrines of the forum state in order to determine which state's substantive law applies. *Klaxon Co. v. Stentor Electric Mfg. Co., Inc.,* 313 U.S. 487, 61 S.Ct. 1020, 85 L.Ed. 1477 (1941); *Blakesley v. Wolford,* 789 F.2d 236 (3d Cir.1986) (quoting *Melville v. American Home Assurance Co.,* 584 F.2d 1306, 1311 (3d Cir.1978)). Pennsylvania has adopted a flexible approach to conflict of laws issues which takes into account both the contacts analysis set forth in the Restatement and the policies and interests of the relevant jurisdictions. *Blakesley,* 789 F.2d at 239, *Cipolla v. Shaposka,* 439 Pa. 563, 267 A.2d 854 (1970); *Griffith v. United Air Lines, Inc.,* 416 Pa. 1, 203 A.2d 796 (1964).

Section 145 of the Restatement (Second) Conflict of Laws (1971) sets forth the general principles and elements to be considered in determining which state's substantive law applies:

§ 145 *The General Principle*

(1) The rights and liabilities of the parties with respect to an issue in tort are determined by the local law of the state which, with respect to that issue, has the most significant relationship to the occurrence and the parties under the principles stated in § 6 [Choice of Law Principles].

(2) Contacts to be taken into account in applying the principles of § 6 to determine the law applicable to an issue include:

(a) the place where the injury occurred,

(b) the place where the conduct causing the injury occurred,

(c) the domicile, residence, nationality, place of incorporation and place of business of the parties, and

(d) the place where the relationship, if any, between the parties is centered.

Section 146 of the Restatement states with greater precision the rule set forth in § 145 as it applies to personal injury actions:

§ 146 *Personal Injuries*

In an action for personal injury, the local law of the state where the injury occurred determines the rights and liabilities of the parties, unless, with respect to the particular issue, some other state has a more significant relationship under the principles stated in § 6 to the occurrence and the parties, in which event the local law of the other state will be applied.

■ Under the Restatement, Ohio clearly has more substantial ties to the issues in the case at bar than Pennsylvania. The only Pennsylvania contact in the instant action is the fact that the plaintiffs reside in Pennsylvania. Otherwise, it is undisputed that the injury alleged (silicosis) occurred in Ohio at the Valley Mould plant, that the conduct causing the alleged injury (exposure to silica dust) occurred at the Valley Mould plant and that all aspects of the relationship between plaintiff and the defendant sand suppliers occurred in Ohio.

Although Pennsylvania has a valid interest in protecting its citizens, Ohio nonetheless has the stronger policy interest in having its law applied since Ohio foundries are regulated by state agencies such as the Industrial Commission of Ohio, Ohio workers' compensation laws apply to individuals working in the state, and Ohio has an interest in providing redress for injuries incurred by individuals working within its borders. We therefore conclude that, because Ohio has the greatest interest in the outcome of this case, Pennsylvania choice of law doctrines require that the substantive tort law of Ohio be applied in this case.

### III.

■ Ohio substantive tort law has adopted § 402A strict liability in products liability cases. However, it is well-established that no strict liability cause of action arising from allegations of inadequate warning can be maintained under Ohio law.[1] *Overbee v. Van Waters & Rogers,* 706 F.2d 768, 770 (6th Cir.1983); *Knitz v. Minster Machine Co.,* 69 Ohio St.2d 460,

432 N.E.2d 814 (1982), *cert. denied Cincinnati Milicron Chemicals, Inc. v. Blankenship,* 459 U.S. 857, 103 S.Ct. 127, 74 L.Ed.2d 110 (1982) (quoting *Temple v. Wean United, Inc.,* 50 Ohio St.2d 317, 325, 364 N.E.2d 267 (1977)); *Leichtamer v. American Motors Corp.,* 67 Ohio St.2d 456, 424 N.E.2d 568 (1981). In *Knitz,* the Ohio Supreme Court rejected the appellant's proposition that failure to provide adequate warning gives rise to a strict liability cause of action. The court relied on its language in an earlier case, *Temple v. Wean United, Inc.,* 50 Ohio St.2d 317, 325, 364 N.E.2d 267, where it stated that "[i]t is ... apparent that the rule imposing obligations on the manufacturer or seller to give suitable warning of a dangerous propensity of a product is a rule fixing a standard of care, and any tort resulting from the failure to meet this duty is, in essence, a negligent act." The court also relied upon its pronouncement in *Leichtamer* that "[t]he absence of a warning does not, without more, provide a basis for [strict] liability[.]"[2] *Id.* (quoting *Leich-*

---

1. A federal court sitting in diversity is bound to apply the law of the state's highest court where matters of state law are at issue. *Ciccarelli v. Carey Canadian Mines, Ltd.,* 757 F.2d 548, n. 3 (3d Cir.1985) (citing *Connecticut Mutual Life Ins. Co. v. Wyman,* 718 F.2d 63, 65 (3d Cir. 1983)). In *Ciccarelli,* the Third Circuit stated that is only when an authoritative pronouncement from the highest court of a state is absent that "a federal court must consider and give due regard to the decisions of State intermediate appellate courts as well as other state courts as indicia of how the state's highest court would decide a matter." *Id.* (citation omitted).

2. Plaintiffs rely on *Temple, Leichtamer,* and *Knitz,* as well as *Birchfield v. International Harvester Co.,* 726 F.2d 1131, 1133 (6th Cir.1984) to support its claim that § 402A of the Restatement gives rise to a strict liability cause of action in products liability cases. While the plaintiffs' analyses of these cases is correct, plaintiffs' application of the strict liability principles enunciated therein to the case at bar is not. What the plaintiffs fail to realize is that those cases are clearly distinguishable from the instant matter because they involved the presence of an alleged design defect, which is neither alleged nor at issue here. Indeed, as mentioned above, *Temple, Leichtamer,* and *Knitz* specifically state that allegations of failure to warn give rise only to an action in negligence.

Plaintiffs also submit that § 402A of the Restatement should be applicable to the instant matter as a result of the Ohio Supreme Court's holding in *Seley v. G.D. Searle & Co.,* 67 Ohio St.2d 192, 423 N.E.2d 831 (1981). In *Seley,* the court recognized a strict liability cause of action for a drug manufacturer's failure to warn of the dangers of a particular drug. The court focused upon comment k to § 402A, which provides that where an "unavoidably unsafe product" is involved, the product will not be considered defective, i.e., the manufacturer will not be held strictly liable, where the product is properly prepared and accompanied by proper directions and warning. Comment k defines "unavoidably unsafe products" as products which; "in the present state of human knowledge, are quite incapable of being made safe for their intended and ordinary use." This point is illustrated in comment (k) by noting that this is especially true of "many new or experimental drugs as to which, because of lack of time and opportunity for sufficient medical experience, there can be no assurance of safety, or perhaps even of purity of ingredients, but such experience as there is justifies the marketing and use of the drug notwithstanding a medically recognizable risk." Restatement (Second) Torts § 402A, Comment k.

*Seley,* however, has been limited in its application. In *Overbee v. Van Waters & Rogers,* 706 F.2d 768 (6th Cir.1983) (citations omitted), the Sixth Circuit stated, "[i]n view of the clear, unequivocal statement in *Knitz* [that alleged failure to warn is essentially a negligent act] ...

tamer v. American Motors Corp., 67 Ohio St.2d 456, 469, 424 N.E.2d 568 (1981)). Thus, because the plaintiffs only allege that the defendants are liable because they failed to warn Mr. Smith of the risks associated with exposure to silica sand, we find that no strict liability cause of action under § 402A exists in the instant matter under Ohio law.

### IV.

■ We now turn to the negligent failure to warn claim and the knowledgeable purchaser defense. This defense developed in negligence cases where the determination of liability is based upon the reasonableness of defendants' conduct. Russo v. Abex Corp., 670 F.Supp. 206 (E.D.Mich. 1987). It is unavailable under the principles of strict liability, where a seller is under a duty to warn all foreseeable users of the dangerous product and the risk of an employer's failure to warn is imputed to the seller. Id. Defendants maintain that they had no legal duty to provide warnings to plaintiff in the instant matter because his employer, Valley Mould, was a knowledgeable purchaser of silica sand.

All parties agree that § 388 of the Restatement (Second) Torts (1971), which has been adopted by Ohio courts, controls. See Sams v. Englewood Ready–Mix Corp., 22 Ohio App.2d 168, 259 N.E.2d 507 (1969). Section 388 provides:

> § 388  Chattel Known to be Dangerous for Intended Use
>
> One who supplies directly or through a third person a chattel for another to use is subject to liability to those whom the supplier should expect to use the chattel with the consent of the other or to be endangered by its probable use, for physical harm caused by the use of the chattel in the manner for which and by a person for whose use it is supplied, if the supplier
>
> (a) knows or has reason to know that the chattel is or is likely to be dangerous for the use for which it is supplied, and
>
> (b) has no reason to believe that those for whose use the chattel is supplied will realize its dangerous condition, and
>
> (c) fails to exercise reasonable care to inform them of its dangerous condition or of the facts which make it likely to be dangerous. .

Each of the three elements must be satisfied in order for liability to attach under § 388.

this Court is compelled to conclude that Seley is limited in application to certain drugs or other products which are 'incapable of being made safe for their ordinary use.' " Thus, the product in question must, in the present state of human knowledge, be incapable of being made safe for ordinary use.

Although the only products which have been determined to be "unavoidably unsafe" by the Ohio courts are asbestos and prescription drugs, this does not preclude other products from being classified as unavoidably unsafe. Plaintiffs, however, neither alleged nor provided any evidence that silica sand, in the present state of human knowledge, is unavoidably unsafe. Plaintiffs only allege that the product supplied by the defendants was "dangerous" and that the defendant suppliers consequently had a duty to warn.

Moreover, the uncontradicted evidence of record demonstrates that the risks associated with silica sand were sufficiently well known as to preclude the product from being classified as "unavoidably unsafe" within the meaning of § 402A. The unrebutted testimony of Carmen W. Pompeii, an industrial hygienist with the Industrial Commission of Ohio, testified that air supplied respirators, although costly, were "normally 100 percent efficient" in keeping out dust. Pompeii Deposition at 36. However, he agreed that, even without air supplied respirators, an employee who worked in an area with proper dust control methods and wore a mask would not contract silicosis. Id. at 91. We also find of relevance the Supreme Court's pronouncement in Urie v. Thompson, 337 U.S. 163, 180, 69 S.Ct. 1018, 1029, 93 L.Ed. 1282 (1949) (quoting Sadowski v. Long Island R. Co., 292 N.Y. 448, 455–66, 55 N.E.2d 497 (1944)), that "it is a matter of common knowledge that it is injurious to the lungs and dangerous to health to work in silica dust."

For this reason, we find plaintiffs' reliance on Stearns v. Johns–Manville Sales Corp., No. 79–2088 (N.D.Ohio Dec. 2, 1985) to be inapposite. Stearns, a case involving asbestos products, followed Seley and the holding in Moran v. Johns–Manville Sales Corp., 691 F.2d 811 (6th Cir.1982) that asbestos was an unavoidably unsafe product and that, therefore, an action in strict liability may be maintained where a manufacturer of an asbestos product failed to provide an adequate warning.

Defendants rely substantially on its contention that the plaintiffs are unable to satisfy clauses (b) and (c) of § 388. With respect to clause (b), the Restatement explains that a supplier is under a duty to inform the users of the product's dangerous condition "if, but only if, he has no reason to expect that those for whose use the chattel is supplied will discover its condition and realize the danger involved. It is not necessary for the supplier to inform those for whose use the chattel is supplied of a condition which a mere casual looking over will disclose[.]" *Id.* Comment k. Where the condition is one which only persons of special experience would realize to be dangerous, a supplier, having such experience, must inform the users of the risk if he "has no reason to believe that those who will use it will have such special experience as will enable them to perceive the danger." *Id.*

When a manufacturer or supplier is under a duty to warn, comment n advises that this duty may be discharged by providing information of the product's dangers to a third person upon whom it can reasonably rely to communicate the information to those who will be exposed to the product. It sets forth a number of considerations which must be balanced in order to ensure that the reasonable care standard of clause (c) has been met.[3] In establishing these factors, the Restatement recognizes that "[m]odern life would be intolerable unless one were permitted to rely to a certain extent on others doing what they normally do, particularly if it is their duty to do so." *Id.* Comment n.

Ohio has not explicitly recognized the knowledgeable purchaser defense.[4] However, defendants have brought to our attention a number of decisions, which may be of relevance to the instant matter, where the knowledgeable purchaser defense was successfully asserted. In the absence of any controlling Ohio decisions, we will consider these decisions.

In *Goodbar v. Whitehead Bros.*, 591 F.Supp. 552 (W.D.Va.1984), *aff'd Beale v. Hardy*, 769 F.2d 213 (4th Cir.1985), the U.S. District Court for the Western District of Virginia recognized the availability of a knowledgeable purchaser defense under § 388 of the Restatement in a negligence action alleging failure to warn. *Goodbar*, which involved claims similar to those in the case at bar, was brought by 132 present and former employees of a Lynchburg, Virginia foundry against 12 defendant silica sand suppliers alleging that the suppliers were liable for failing to warn Lynchburg's employees of the dangerous characteristics of exposure to silica.

---

**3.** These considerations are:

(1) the dangerous condition of the product;
(2) the purpose for which the product is used;
(3) the form of any warnings given;
(4) the reliability of the third party as a conduit of necessary information about the product;
(5) the magnitude of the risk involved;
(6) the burdens imposed on the supplier by requiring that he directly warn all users.

*Goodbar v. Whitehead Bros.*, 591 F.Supp. 552, 557 (W.D.Va.1984).

**4.** Defendants assert that the Sixth Circuit Court of Appeals endorsed the "knowledgeable purchaser" defense under Ohio law in *Adams v. Union Carbide Corp.*, 737 F.2d 1453 (6th Cir.), *cert. denied*, 469 U.S. 1062, 105 S.Ct. 545, 83 L.Ed.2d 432 (1984). We cannot agree. In *Adams*, the plaintiff alleged that Union Carbide had failed to warn employees of General Motors of the dangerous propensities of toluene diisocryanate (TDI). Union Carbide supplied TDI to GM in bulk liquid shipments by tank trucks and rail tank cars and transferred the substance directly into GM's storage tanks. The court held that Union Carbide had no duty to warn GM's employees directly and that it had exercised reasonable care by warning GM of the risks of exposure to TDI. *Adams* cannot be construed to endorse the knowledgeable purchaser defense since its holding was based upon the fact that Union Carbide had provided comprehensive information to GM regarding the dangerous propensities of TDI, and not solely because GM was a knowledgeable purchaser and therefore had a duty to provide its employees with a safe workplace. Essentially, Union Carbide's duty to warn GM's employees was discharged, as provided by comment n to the Restatement (Second) Torts, § 388, because it satisfied its duty by providing information to GM, upon which it reasonably relied to convey that information to its employees. Moreover, *Adams* is clearly distinguishable from the facts here, where there is no evidence that the defendant and third-party defendant sand suppliers have provided any warnings to Valley Mould.

The court employed the analysis set forth in § 388 of the Restatement to resolve the negligent failure to warn claim. Because the defendants conceded that the products they supplied contained a dangerous substance and that the plaintiff users were not aware of these dangers, the court declared that the matter therefore turned "upon whether the requirements of clause (c) had been met, namely, whether the Defendants failed to exercise reasonable care in relying upon the Foundry to supply its employees with the necessary information to satisfy the duty to warn." *Id.* at 557. The court noted that it, at any rate, felt that "the more pertinent inquiry should be the reasonableness standard of clause (c)." *Id.* The court turned to comment n and recognized that, in order to make that determination, a balancing of the various considerations delineated therein was "necessary in light of the fact that no single set of rules could possibly be advanced that would automatically cover all situations." *Id.* Based upon its reading of § 388 and comment n as well as a number of cases where the knowledgeable purchaser defense had been recognized, the *Goodbar* court adopted the knowledgeable purchaser defense and held that, "when the supplier has reason to believe that the purchaser of the product will recognize the dangers associated with the product, no warnings are mandated." *Id.* at 561. The court reviewed the evidence submitted by the defendants and found that a "plethora of material exist[ed] on the Lynchburg Found-ry's extensive knowledge of the hazards of inhaling silica dust, the disease of silicosis, and proper dust control methods", the court granted the defendant sand suppliers' motion for summary judgment. *Id.* The court additionally found that the defendants had no duty to warn the employees since only the employer was responsible for providing a safe workplace and was the only one in a position to effectively communicate any warnings to its employees. The employer, therefore, should be the one to provide warnings of any employment-related dangers.[5]

In *Higgins v. E.I. DuPont de Nemours & Co., Inc.*, 671 F.Supp. 1055 (D.Md.1987), *aff'd* 863 F.2d 1162 (4th Cir.1988), a case involving claims of negligence, strict liability and warranty arising from the defendants' alleged failure to warn of possible teratogenic effects of Imron paint, the U.S. District Court sitting in Maryland relied upon the reasoning in *Goodbar* and endorsed the knowledgeable purchaser defense. Although Maryland courts had not explicitly recognized this defense, it noted that the Court of Appeals of Maryland had "clearly adopted § 388 as an authoritative statement of the general principles regarding negligent failure to warn in Maryland." *Id.* at 1059. The court thereafter stated that "[t]he recognition of the sophisticated user/bulk supplier defense logically follows from the sense of § 388, as clearly pointed out by Judge Kiser in *Goodbar*, and as recognized by the Fourth Circuit." *Id.*

---

5. The *Goodbar* court identified a number of difficulties the defendant sand suppliers would face in attempting to warn the foundry's employees of the risks of prolonged exposure to silica sand:

(1) the identification of the users or those exposed to its products would require a constant monitoring by the suppliers in view of the constant turnover of the Foundry's large work force;

(2) the manner in which the sand products are delivered in bulk (i.e. unpackaged railroad car lots or truck);

(3) no written product warnings placed on the railroad cars would ever reach the workers involved in casting or those in the immediate vicinity due to the way the loose sand is unloaded, conveyed, and kept in storage bins until needed;

(4) only the Foundry itself would be in a position to provide the good housekeeping measures, training and warnings to its workers on a continuous and systematic basis necessary to reduce the risk of silicosis;

(5) the sand suppliers must rely on the foundry to convey any safety information to its employees;

(6) the confusion arising when twelve different suppliers and the Foundry each try to cope with the awesome task of instructing the Foundry workers and

(7) in a commercial setting, it would be totally unrealistic to assume that the suppliers would be able to assume that the suppliers would be able to exert pressure on a large, industrial customer such as the Foundry to allow the suppliers to come and educate its workers about the hazards of silicosis.

*Goodbar*, 591 F.Supp. at 566.

We also note here that the Sixth Circuit, although not applying Ohio law, has also recognized the knowledgeable purchaser defense in an unpublished opinion, *Ryntz v. Afrimet Indussa, Inc.*, 887 F.2d 1087 (6th Cir.1989). *Ryntz* involved a plaintiff, Mr. Ryntz, whose employment as a lathe operator and grinder allegedly exposed him to cobalt dust, which caused his injuries and subsequent death. An action was brought alleging failure to warn on the part of defendant companies which had supplied cobalt to Mr. Ryntz's employer. The Sixth Circuit upheld the district court's grant of summary judgment in favor of the defendants on the ground that the defendants had no duty to warn Mr. Ryntz of the hazards of cobalt because his employer was a sophisticated user with full knowledge of its dangerous propensities. It also added that the defendant cobalt suppliers could therefore rely on Mr. Ryntz's employer to warn its employees.

Despite the fact that Ohio has not explicitly recognized the knowledgeable purchaser defense, we are confident that the Ohio Supreme Court would recognize this defense in the instant matter given the facts of the case before us.[6] The Ohio Supreme Court has adopted § 388 of the Restatement as authoritative in negligent failure to warn cases and we believe that it would duly recognize the knowledgeable purchaser defense to logically follow from the sense of § 388, as did the courts in *Goodbar* and *Higgins*. Our determination here, then, focuses upon whether the purchaser, Valley Mould, was a knowledgeable purchaser of silica sand and whether the defendant sand suppliers failed to exercise reasonable care in relying upon Valley Mould to provide the appropriate warnings to its employees concerning the risks involved with exposure to silica sand. After reviewing the numerous appendices, affidavits, depositions and exhibits which have been submitted, we find that Valley Mould was a knowledgeable industrial purchaser of silica sand and that ample evidence exists pertaining to Valley Mould's knowl-

edge of the possible hazards of inhaling silica dust, of the disease of silicosis and of proper dust control methods at the Valley Mould plant.

The affidavit of defendants' expert, Dr. Daniel C. Braun, M.D., who worked as Medical Director and Senior Fellow for the Industrial Health Foundation ("IHF") from 1952 to 1958, served as its Manager of Occupational Medicine Services from 1970 to 1972 and as its President since 1972, indicates that the risks associated with long term exposure to free silica and the disease of silicosis had been commonly known within the foundry industry since the early 1900's. The IHF was founded in 1935 as a nonprofit organization for the advancement of healthful industrial work conditions and serves as an independent consultant to its members in the area of employee health and safety. It provides information to its members concerning occupational diseases such as silicosis and the preventive measures which may be taken, and publishes the *Industrial Hygiene Digest*, which, since 1937, has abstracted hundreds of articles pertaining to silicosis and the methods of monitoring and controlling exposure to free silica. The IHF's records show that Valley Mould was a member of the IHF from 1937 to 1968 and as such, received its publications and was informed of meetings and seminars concerning various subjects, including silica risks. Dr. Braun testified that, by at least 1937, the foundry industry had identified the sources of silica exposure and had begun to implement engineering controls and procedures. By 1940, the foundry industry was aware of and certain companies had initiated silicosis programs which included periodic medical reviews, distribution of information to employees concerning silicosis, monitoring the silica levels in the air and distribution of personal protective devices to employees.

While INF membership alone does not establish knowledge, Robert H. Welton, who was employed by Valley Mould from

---

6. Plaintiffs, in fact, have recently acknowledged the legitimacy of such a defense in certain appropriate fact situations under both Ohio and Pennsylvania law, although they submit that the defense is not applicable under the facts of this case.

1957 to 1987 and served as Manager of Industrial Relations since 1968, testified that "[a]s of and prior 1968, Valley Mould was aware of the causes of silicosis (inhaling respirable free silica over a long period of time) and the methods of protecting a foundry work force from silicosis (including plant ventilation, use of masks in certain jobs, good housekeeping and dust suppression)." Affidavit of Robert H. Welton, ¶ 4. Such protective measures were implemented as of and prior to 1968.

A number of Valley Mould management and employees directly testified to Valley Mould's ongoing knowledge of the risks of silica exposure and the methods of controlling and monitoring employees' exposure to silica dust. Edward D. Rahde, who served as Valley Mould's Supervisor of Safety from 1972 to 1976 and Superintendent of Stores from 1976 to about 1983, stated that when he arrived at Valley Mould in 1972, the foundry and its employees were well educated about the risks of silica dust and prevention devices such as respirators and dust removal equipment were in use. Also, a policy and procedure existed to inform Valley Mould employees of the hazards of silica dust and the prevention of dust-related diseases. When asked whether he had asked any sand suppliers about the dangers of silica dust, Rahde stated that he did not feel it was necessary to consult with any sand suppliers regarding the risks of dust or the methods of preventing dust related diseases because he was already educated in those matters.

On April 1, 1973, the use of respirators by employees having certain jobs became mandatory at the Valley Mould plant. Valley Mould also established a disciplinary action procedure which consisted of a verbal warning, a written warning, one day suspension, three day suspension, five day suspension and finally, termination for failure to wear masks or respirators. Valley

Mould revised its Employee Safety Manual, which each employee was given, to contain this information. On June 8, 1973, Rahde issued a memorandum noting that "some employees who should be using respirators are not doing so" and reinforcing the importance of employee compliance with Valley Mould's policy of wearing respirators on certain jobs. He strongly recommended that "each foreman be re-instructed that they must enforce the use of respirators as a part of each job listed." Kimpan Deposition, Exhibit 5. Rahde stated that he issued the memorandum in an effort to improve enforcement of company regulations which were directed towards protecting employees' lungs from contaminants such as dust and sand.

According to Donald G. Majors, who served as a Time Study Engineer at Valley Mould's Industrial and Engineering Department from 1956 until 1964 and as Line Supervisor, Turn Supervisor and General Supervisor from 1964 to 1986, Valley Mould established a program to clean up the plant and to improve working conditions in the late 1960's. Prior to this, Valley Mould had ventilation systems and fans installed in work areas to reduce airborne dust. Majors testified, "[w]e were gearing up at that time for 1970. OSHA went into effect, was made law, so we were more or less—we had quite a program of improvements we had to make in order to meet the law[.]" Majors Deposition at 21. Among the improvements made after 1970 were the installation of dust collectors throughout the plant and conversion to the No-Bake method of mould making, which eliminated a substantial amount of the dust and noise characteristic of traditional mould making.

Between 1956 and the late 1960's, Majors stated that protective devices, namely respirators, were always available to employees but that their use was not compulsory.[7]

---

7. There appears to be some discrepancy in the various testimonies regarding when masks and respirators actually became available at Valley Mould. Lloyd J. Hoover, who began working at Valley Mould in 1964, stated that masks and respirators were not available until about 1975 and that, until that time, employees were sup-

plied with and wore rags around their faces for the purpose of keeping dust out. Assuming arguendo that rags were used in the 1950's and 1960's and that masks and respirators were not supplied by Valley Mould until 1975, we do not believe that this in any way reduces Valley Mould's knowledge of the hazards of prolonged

According to John J. Kimpan, who was employed with Valley Mould from 1933 to 1979 in a number of positions until he became Plant Superintendent in 1970, "Valley Mould made sure that [the respirators] were made available to the men ... As a matter of fact, they were told [by supervisors and the Safety Committee] to make sure they use them when there is dust." Kimpan Deposition at 19. From 1964 on, Majors confirmed that the possibility that the inhalation of silica sand and dust could be hazardous to the employees' health was "definitely" common knowledge among the workers because of Valley Mould's safety education programs and monthly safety meetings at which workers were "constantly" informed about such hazards. *Id.* at 26–27.

Valley Mould's knowledge is further confirmed by the testimony of Darrell DePaul, who was employed by Valley Mould as a Casting Foreman and Core Foreman. DePaul was responsible for informing employees about safety procedures, on a group and individual basis, and testified that he discussed the topic of dust control and preventive measures with employees. Although he did not inform employees that masks or respirators should be worn to prevent silicosis per se, he stated that he knew and assumed that the employees also knew that silicosis was a possible disease. Similarly Lloyd J. Hoover, an employee, agreed that the topic of dust was discussed at monthly safety meetings "all the time." Hoover Deposition at 32. Even plaintiff himself testified that Valley Mould "told everybody" that the workers should protect themselves from the dust and sand in the air and that he was in fact cited for not wearing a respirator. Smith Deposition at 122–124.

The evidence also demonstrates that, between 1949 and 1968, numerous workers' compensation claims had been filed by Valley Mould employees alleging that they had contracted silicosis from the inhalation of dust in Valley Mould's foundries, thus further substantiating the claim that Valley Mould had knowledge of silica-related hazards. According to the records presented by Margaret J. Bennett, Custodian of Valley Mould's workers' compensation records, Valley Mould received workers' compensation claims alleging silicosis as early as February 6, 1947. Bennett Affidavit, Exhibit L. In July 1949, Valley Mould received a silicosis claim from a chipper, Harry Stinson. In a letter dated August 5, 1949, Valley Mould's Personnel Manager, on the advice of Stinson's physician, recommended that he be transferred to a job as a service room attendant and outside yard laborer. which would not expose him to silica dust. Upon further recommendation, Valley Mould agreed to purchase a vacuum cleaner for Stinson's use in order to eliminate exposure to silica sand and dust from the floors.

Moreover, Stinson's file indicates that the Industrial Commission of Ohio made dust readings at Valley Mould's Hubbard, Ohio branch as early as June 1939 and reported the results to the company. The record additionally demonstrates that plant inspections were made at Valley Mould by Self–Insurers Service, Inc. in December 1971, National Loss Control Corporation in January 1974 and OSHA in March 1974. The reports from these inspections indicated that air samples were taken at Valley Mould in order to determine the levels of airborne silica and made note of the need for improvement and the need for employees to wear masks or respirators. Kimpan Deposition, Exhibit 1, 6, 7. In light of these factors, it is clear that Valley Mould was knowledgeable of silica related hazards.[8] Information regarding silica and sil-

---

exposure to silica dust. The relevant point is not when Valley Mould supplied masks or respirators, but that Valley Mould's awareness that silica dust posed a possible health hazard caused it to believe it necessary to make some form of protection available to employees who were exposed to silica dust.

**8.** In their supplemental responsive brief, plaintiffs point to the testimony of three individuals to support their claim that the evidence "strongly indicates that executives and management personnel at HVM had no knowledge of any hazards involved with the inhalation of silica dust." Supplemental Brief in Support of Plaintiff's Response at 8.

icosis was available to Valley Mould as early as 1937 when it became a member of the IHF and, in the 1950's, when plaintiff became employed with Valley Mould, protective measures to reduce dust exposure had already been implemented.

It is also apparent that Valley Mould is in the best position to communicate effective warnings about the hazards of prolonged exposure to silica sand and dust. Sand was delivered in bulk form to Valley Mould by truck to an area of Valley Mould set apart from the main building. The sand was weighed in, then taken and blown up into silos where it was stored until it was ready to be used. Prior to 1978, before the conversion to No–Bake, sand had been delivered by trucks and then unloaded or dumped onto sand piles. Cranemen thereafter moved the sand from the piles into storage bins. None of the foundry workers, such as the chippers, rammers and shakeout area men, had any connection with or were able to observe any part of the delivery process. Because sand was supplied in bulk form, it was not possible for warnings to be placed directly on the product. Moreover, because Valley Mould employees customarily had no access to the delivery area or process, any written warnings on the delivery trucks themselves would not have reached the workers. To require every sand supplier to go into the workplace and educate each worker as to the hazards of prolonged exposure to silica would be an unreasonable burden which we decline to impose. As noted in *Goodbar*, the employer should bear the responsibility of providing a safe workplace and of giving warnings of job-related hazards. We agree that "[o]nly the employer is in a position to ensure workplace safety by training, supervision and use of proper safety equipment. Designating the manufacturer as an absolute insurer of its product removes the economic incentives that encourage employers to protect the safety of their employees." 591 F.Supp. at 567 (quoting Schwartz and Driver, *Warnings In The Workplace: The Need For A Synthesis Of Law And Communication Theory*, 52 U.Cin.L.Rev. 38, 43 (1983)).

### V.

Plaintiffs have also alleged a cause of action founded upon breach of warranty. No issue of material fact exists with respect to this claim. Beyond the claim set forth in the complaint, no suggestion has been made nor any evidence advanced by the plaintiffs in support of any warranties, either express or implied.[9] We also note that the Ohio Supreme Court has declared that " 'there are virtually no distinctions between Ohio's "implied warranty in tort" theory and the Restatement version of strict liability in tort....' " *Leichtamer*, 67 Ohio St.2d 456, 424 N.E.2d at 575 (quoting *Temple v. Wean United, Inc.*, 50 Ohio St.2d 317, 364 N.E.2d 267, 271). Because we determined earlier that no strict liability action exists in this matter under § 402A,

While in any consideration of a motion for summary judgment we must construe the evidence in a light most favorable to the plaintiffs, plaintiffs cannot create an issue of fact by a mere "scintilla" of evidence, but must show that a genuine issue of fact exists which would permit a verdict in their favor by a reasonable jury. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). First, we note that we do not find all of plaintiffs' illustrations persuasive. The excerpt from Darrell De-Paul's deposition indicates that Valley Mould was, in fact, conscious of employee safety and that the topic of dust and the minimalization of dust inhalation was regularly discussed with employees during safety meetings. DePaul's uncertainty with regard to whether foremen instructed employees on the use of masks and the injuries that could result from excessive exposure to silica dust when he himself was an

hourly employee only illustrates inadequate enforcement by Valley Mould and not Valley Mould's lack of knowledge.

More importantly, we do not believe that the possibility that two or three individuals may not have had knowledge negates Valley Mould's knowledge where the evidence of that knowledge is overwhelming.

9. As the *Higgins* court noted, "the making of any express warranty relating to product safety in the bulk supply context appears inconceivable to this Court". 671 F.Supp. at 1063. Further, with respect to any alleged implied warranties of merchantability, the *Goodbar* court held, "[w]hen a skilled purchaser ... knows or reasonably should be expected to know of the dangerous propensities or characteristics of a product, no implied warranty of merchantability arises." 591 F.Supp. at 567 (citations omitted).

any cause of action founded upon an implied breach of warranty in tort must likewise fail.

## VI.

We conclude that there is no question of material fact that Valley Mould was knowledgeable of silica-related hazards and that Valley Mould was therefore in the best position to convey any such knowledge to its employees. Consequently, the defendant sand suppliers reasonably relied upon Valley Mould to convey any warnings to its employees and no duty existed for the defendants to directly warn plaintiff or other Valley Mould employees of the hazards of prolonged exposure to silica sand. Accordingly, as a matter of law, defendant Pennsylvania Glass Sand Corporation's motion for summary judgment on behalf of itself, Walter C. Best, Inc. and the third-party defendants, Manley Brothers, Keener Sand and Clay Company and Whitehead Brothers is granted.