Carolyn B. FISHER, Executrix of the Estate of Ralph L. Fisher, deceased, Plaintiff,

v.

MONSANTO COMPANY, a Delaware Corporation, Defendant.

Civ. A. No. 93–0037–D.

United States District Court, W.D. Virginia, Danville Division.

June 7, 1994.

Robert Lord Morrison, Jr., W. Williams, Stilwell, Morrison & Williams, Danville, VA, Michael J. Warshauer, Van Kirk McCombs, James Read Holland, II, Burge & Wettermark, Atlanta, GA, for plaintiff.

Anthony H. Monioudis, Woods, Rogers & Hazlegrove, Danville, VA, David M. Moore, II, Donald Cowan, Jr., Fran M. Shaver, John J. Korzen, Smith, Helms, Mullins & Moore, Greensboro, NC, for defendant.

## MEMORANDUM OPINION

KISER, Chief Judge.

Facts According to the Complaint:

Ralph Fisher died from terminal brain cancer because, according to Plaintiff, he was exposed to polychlorinated biphenyls (PCP), and known contaminants including polychlorinated dibenzofurans (PCDF), manufactured by Defendant Monsanto.

Defendant Monsanto manufactured polychlorinated biphenyls ("PCBs") to be used in the manufacturing and testing and as a dielectric fluid in electrical transformers manufactured by Westinghouse Electric Corporation at its plant in South Boston, Virginia. Plaintiff Fisher had been employed as a mechanic and machinist at the transformer manufacturing plant in South Boston, Virginia since 1972.

The plaintiff argues that at the time of Fisher's exposure to the PCB fluids used in the manufacturing, testing and ultimate product of transformers, defendant Monsanto was aware that PCBs were unreasonably dangerous and likely to cause injury and death to human beings who were exposed to the PCB fluids including PCB residues, PCB contaminants, and contaminated mineral oil dielectric fluids, during service and use of transformer products. Fisher was exposed to PCBs throughout the course of his work in the transformer manufacturing plant owned by Westinghouse. More specifically, Fisher was exposed to PCB fumes, and was caused to inhale the PCB contaminated fluids, mists,

liquids, and steams and he was caused to absorb PCB through contact with his skin. The PCB to which Fisher was exposed was contaminated with polychlorinated dibenzofurans (PCDF). As a result of his exposure to PCBs and its contaminants, Fisher was caused to contract terminal brain cancer. Fisher died from brain cancer subsequent to the filing of this action.[1]

### Discussion

Plaintiff initially filed a five count Complaint alleging: 1) strict liability for Ultra hazardous product; 2) negligence; 3) fraud; 4) breach of warranty; and 5) punitive damages. Plaintiff, by Carolyn B. Fisher, Executrix of the Estate of Ralph L. Fisher, moves the Court to permit her to amend the Complaint to state an action for wrongful death pursuant to Va.Code Ann. § 8.01–50 *et seq.*

Jurisdiction is based upon diversity of citizenship pursuant to 28 U.S.C. § 1332. Venue is proper because the events and omissions that give rise to plaintiff's cause of action occurred in the Western District of Virginia.

### Defendant's Motion for Summary Judgment:

The thrust of Monsanto's motion is that it is entitled to summary judgment under the sophisticated purchaser and bulk supplier defenses. Monsanto argues that it reasonably relied on its bulk purchaser, Westinghouse, which had extensive knowledge and expertise regarding PCB dielectric fluids, to inform its employees about Monsanto's and Westinghouse's recommended handling procedures. As a bulk supplier, Monsanto argues, Monsanto had no duty to warn the plaintiff.

Plaintiff's response, in a nutshell, is that contrary to defendant's argument, it cannot be determined as a matter of law that defendant adequately warned anyone of the dangers of its PCB products; it cannot be determined as a matter of law that Westinghouse was a sophisticated purchaser of PCB products shielding defendant of its duty to warn; it cannot be determined as a matter of law that defendant did not breach various war-ranties to which Ralph Fisher was the beneficiary; it cannot be determined as a matter of law that defendant's PCB product is not ultrahazardous as manufactured, delivered and used; and, it cannot be determined as a matter of law that defendant did not fraudulently misrepresent its PCB products.

### Discussion

█ I. Monsanto argues that it is entitled to summary judgment on plaintiff's negligent failure-to-warn claim because, as the supplier of a bulk product to a sophisticated purchaser, Monsanto had no duty to warn plaintiff. Monsanto relies on this Court's opinion in *Goodbar*, wherein this Court held that Virginia recognizes the sophisticated purchaser defense. *Goodbar v. Whitehead Bros.*, 591 F.Supp. 552, 559–61 (W.D.Va.1984), *aff'd sub. nom. Beale v. Hardy*, 769 F.2d 213 (4th Cir.1985). This Court has summarized the sophisticated purchaser defense thusly:

> [I]n alleged negligent failure to warn situations such as this litigation, if the danger related to the particular product is clearly known to the purchaser/employer, then there will be no obligation to warn placed upon the supplier. Instead, it becomes the employer's responsibility to guard against the known danger either by warning its employees or otherwise providing the necessary protection. Stated another way, when the supplier has reason to believe that the purchaser of the product will recognize the dangers associated with the product, no warnings are mandated.

*Id.* at 560–61.

Monsanto has presented ample evidence that Westinghouse had considerable knowledge and expertise regarding the use of Inerteen.[2] Westinghouse acquired its knowledge and expertise by developing the specifications for Inerteen, performing research and keeping abreast of public domain research on PCB dielectric fluids, participating in trade organizations, corresponding with Monsanto and others, attending meetings, receiving various publications, and issuing its own publications. *Spangler v. Kranco, Inc.*, 481 F.2d

---

1. Fisher died on September 30, 1993.

2. Inerteen is the trade name for a chemical manufactured by Monsanto for Westinghouse according to Westinghouse's specifications. Inerteen contains PCBs.

373, 375 (4th Cir.1973), a diversity case applying Virginia law, held that a manufacturer that built a crane according to its customer's specifications could not be held liable for a failure to warn an employee of the customer's subcontractor. The court stated:

> We find additional support ... in the principle that the products liability rule holding a manufacturer liable does not apply where the product has been manufactured in accordance with the plans and specifications of the purchaser....

*Id.* at 375.

Monsanto argues accordingly that it was reasonable for Monsanto to rely on Westinghouse as the developer of Inerteen and as one of this country's leading industrial companies, to convey information to its own employees. I agree. As Monsanto points out, Westinghouse had corporate medical and industrial hygiene departments devoted to employee safety, and individual plants, such as South Boston, had their own medical departments.

Plaintiff argues that the record does not reflect that Westinghouse had sufficient knowledge about the toxicity of PCBs to humans and further does not reflect that Westinghouse had any knowledge of the contamination of Inerteen with PCDFs. I disagree. The record reflects that Westinghouse had 50 years' experience in working with chlorinated dielectric fluids for its machines and developed Inerteen. Defendant has proffered several exhibits supporting its argument that Westinghouse was a sophisticated user, including—but not limited to— the following (1) Medical Research Project No. MR–46 entitled *The Toxicity and Potential Dangers of Inerteen* which summarizes the hazards of Inerteen to the skin and liver and suggests preventative measures to reduce the risk of injuries resulting from exposure to Inerteen; (2) the September 15, 1947, letter from Industrial Hygiene Engineer, E.C. Barnes to J.W. Wigert, Materials and Process Engineer, regarding safe handling and storage procedures for Inerteen; (3) the October 23, 1959, letter to Wilbur Speicher, Westinghouse's Administrator of Industrial Hygiene, from Elmer Wheeler, Assistant Director of Westinghouse's Medical Depart-

ment which states, *inter alia,* that "sufficient exposure [to the chemicals in Inerteen], whether by inhalation of vapors or skin contact, can result in chloracne which I think we must assume could be an indication of more serious systemic injury if the exposure was allowed to continue."; (4) an April 30, 1962, correspondence from Wheeler to Speicher states that "In our own operations we try to stress prevention of skin contact [with chemicals used in Inerteen] rather than the use of creams."; (5) an internal Westinghouse memorandum dated April 23, 1970, which lists the environmental concerns over Inerteen and states "... I see [the hazards of Inerteen] as a matter of great concern, potentially bad enough to force us out of the Inerteen transformer business. At best, we must institute a much, much tighter control over the usage and disposal of Inerteen, as well as all other materials to which it has been exposed."; (6) the Interdepartmental Task Force on PCBs report entitled *Polychlorinated Biphenyls and the Environment,* which reviews 40 years of PCBs and states that PCBs should be restricted to limited uses because they could have adverse effects on human health. *See* pp. 2–5. Page 81 of the report reveals the continuing need for PCBs and the concomitant requirement of unusual protective measures in the use of PCBs; (7) a Westinghouse memorandum dated April 23, 1971, outlining the safe handling procedures established for handling and disposing of Inerteen liquid dielectrics; and (8) the safe practice data sheet revised November 17, 1972, generated by Westinghouse's Industrial Hygiene Laboratory, which specifies: the proper storage procedures for Inerteen, the properties of Inerteen, the adverse health consequences of exposure to Inerteen, waste control and disposal of Inerteen, personal protective equipment to be used when handling Inerteen and precautions and first aid to be used in handling Inerteen.

Plaintiff argues that defendant's Motion for Summary Judgment must fail because defendant has not provided any affidavits of Westinghouse employees indicating that Westinghouse knew of the hazards of PCBs. I find, however, that Westinghouse's internal documents and the statement of the Chair-

man of Westinghouse's Board of Directors, D.C. Burnham, which appears in the Interdepartmental Task Force on PCBs' report[3] ample evidence that the danger related to Inerteen was clearly known to Westinghouse and that therefore it was Westinghouse's duty—not Monsanto's duty—to guard against the known danger either by warning its employees or otherwise providing the necessary protection. The foregoing recitation of defendant's evidence reveals that Monsanto had good reason to believe that Westinghouse recognized the dangers inherent in Inerteen.

Furthermore, as Westinghouse aptly points out, the facts of this case meet the *Goodbar* requirements relieving Monsanto of any obligation to warn individual Westinghouse employees. First, Monsanto was not in a position to constantly monitor the turnover of an employer's workforce.[4] Second, Inerteen was delivered to Westinghouse in bulk and it was accordingly impossible to label Inerteen, a liquid product, delivered in bulk. Third, because Inerteen was shipped in bulk by railroad cars, the warnings Monsanto placed on the product would not reach all employees. Defendant points out that Ralph Fisher was never involved in unloading tank car shipments. Defendant's Ex. 28 at 5–6. Fourth, only Westinghouse was "in a position to provide the good housekeeping measures, training and warnings to its workers on a continuous and systemic basis." *Goodbar*, 591 F.Supp. at 566. Finally, Monsanto could reasonably rely on Westinghouse to convey safety information to its employees.

For these reasons, I find that Westinghouse a sophisticated user. I accordingly will grant summary judgment on plaintiff's negligence claim because Westinghouse was a sophisticated user and Monsanto reasonably relied on Westinghouse to warn its employees of the danger of PCBs.

---

**3.** Burnham stated in the report:

It is also clear that there are no present or prospective substitutes for these [PCB] materials, and that the function that they perform is essential. Thus, the continuing need for PCBs in closed electrical system applications is conclusive. The electrical industry well understands, however, that continued use of these

*Plaintiff's Strict Liability Claim*

Plaintiff's second claim alleges that Monsanto is strictly liable for Fisher's injuries. Plaintiff's strict liability claim is patterned on § 402A(1) of the Restatement (Second) of Torts, which states in pertinent part, "One who sells any product in a defective condition unreasonably dangerous to the user . . . is subject to liability for physical harm thereby caused to the ultimate user. Monsanto points out that the Supreme Court of Virginia has not adopted § 402(a) strict liability, and Virginia's legislature has not enacted equivalent or analogous legislation. Plaintiff also argues that PCB is ultrahazardous as manufactured and delivered. Plaintiff's argument here does not make much sense. In effect, plaintiff claims that PCBs are ultrahazardous but then launches into an argument about how defendant exposed plaintiff to an unreasonable risk without adequate warning. In any event, plaintiff's ultrahazardous activity claim does not pertain to Monsanto because Monsanto did not carry on any ultrahazardous activity involving plaintiff. In this regard, Monsanto points to a Seventh Circuit decision which held that ". . . the marketing of the PCBs was not dangerous itself. . . . *Citing City of Blomington, Indiana v. Westinghouse Elec. Corp.*, 891 F.2d 611 (7th Cir.1989).

*Breach of Warranty*

I find that no warranty arose between Monsanto and Plaintiff's employer that would support Plaintiff's breach of warranty claim. First, besides warranting good title and that all Inerteen sold conformed to Westinghouse's specifications, Monsanto made no express warranties and, therefore, plaintiff has no claim for breach of express warranties. Second, no implied warranty of fitness arose because Monsanto produced Inerteen according to Westinghouse's own specifications, and Westinghouse, therefore, was not "relying on

materials requires unusual protective measures.
Defendant's Exhibit 31 at 81.

**4.** The workforce at Westinghouse's South Boston plant was between 600 and 650 employees. Murray Dep. Tr. at 11.

the seller's skill or judgment to select or furnish suitable goods." Va.Code Ann. § 8.2–315. Monsanto also argues that no implied warranty of merchantability arose because Westinghouse was a sophisticated purchaser. I agree. *See Goodbar*, 591 F.Supp. at 567 (finding that where skilled purchaser, such as foundry, knew or reasonably should have been expected to know of dangerous propensities or characteristics of silica products, no implied warranty of merchantibility arose). In addition, at the time of sale, Monsanto expressly disclaimed any warranties other than good title and production according to specifications. Monsanto also has a disclaimer of warranties provision on its products which is set forth on page 26 of its Brief in Support of its Motion for Summary Judgment. The authority that plaintiff cites in support of its argument that "Monsanto is not allowed to limit by disclaimer of warranties an injured person's claim for personal injury damages", *citing* plaintiff's brief at 31, are unavailing to plaintiff's position. First, Va.Code Ann. § 8.2–719 provides that contractual agreements may include limitations of liability. Va.Code Ann. § 8.2–719(1)(a). The record indicates that Monsanto provided Inerteen to Westinghouse subject to a limitation of liability. *See* Defendant's Ex. 25 paras. 5–6. Section 8.2–719 only prohibits such limitations of liability in the sale of consumer goods, Va.Code Ann. § 8.2–719(3). There is no evidence in this case indicating that Inerteen is a consumer good. Second, Plaintiff's case law authority, *Matthews v. Ford Motor Co.*, 479 F.2d 399 (4th Cir.1973) is inapposite because it involved a consumer good, i.e., an automobile. Finally, plaintiff's argument that an implied warranty arose through Monsanto's alleged "course of conduct", *citing* plaintiff's brief at 32, fails because section 8.2–314, while recognizing that an implied warranty can arise from a "course of dealing" between merchants, the section further provides that no implied warranty arises where it has been expressly disclaimed. *See* Va.Code Ann. §§ 8.2–314(1), (3).

### Plaintiff's Fraud Claim

There is no factual support for plaintiff's allegations of fraud. In pleading fraud, plaintiff has alleged that Monsanto "represented to the buying and using public that the electrical transformer PCB dielectric products manufactured by it were safe in regular use. Plaintiff also alleges that, in reasonable reliance on Monsanto's representation that its products were safe in regular use, plaintiff took no precautions to protect himself in handling, using, and servicing the electrical transformer PCB dielectric products. *See* Complaint at 20.

The evidence adduced by Monsanto indicate that Monsanto consistently informed Plaintiff's employer about Inerteen through correspondence, product labels, MDS Sheets, meetings and various other means of communication. Furthermore, as Monsanto points out, there is no "buying public" for Monsanto's PCB dielectric fluids. The record reflects that Monsanto manufactured PCB dielectric fluids to the specifications of a limited number of customers in the electrical equipment industry and did not market them to the public at large. In sum, Plaintiff has identified no false representations to Westinghouse and has no support for the other elements of a fraud claim.

### Conclusion

This case falls within the all-to-frequent pattern of an employee sustaining a profound on-the-job injury and, because the Virginia Workers' Compensation Act bars a claim against his employer, he must search for a third party for recompense. The primary responsibility for a worker's safety falls to the employer. Thus, if it is society's will that employees should be compensated for these injuries, the proper solution is a liberalization of Virginia's Workers' Compensation Act— not a tortured application of the law of torts and the law of sales. This would make the employer more responsible for and more responsive to the safety needs of his employees.

### Plaintiff's Claim for Punitive Damages

Because I will grant summary judgment on plaintiff's negligence, strict liability, breach of warranty and fraud claims, summary judgment on plaintiff's claim for puni-

tive damages is, as Monsanto correctly points out, required.

An appropriate Order will be entered.