REMOLINDO HOFFMAN, special administrator,[1] vs. HOUGHTON
CHEMICAL CORPORATION & another[2]
(and a companion case[3]).

Middlesex. March 12, 2001. - July 19, 2001.

Present: MARSHALL, C.J., GREANEY, IRELAND, SPINA, COWIN, SOSMAN, & CORDY, JJ.

*Negligence,* Wrongful death, Manufacturer, Toxic chemical, Duty to warn,
Adequacy of warning, Bulk supplier doctrine. *Warranty. Practice, Civil,*
Instructions to jury. *Evidence,* Failure to produce witness.

Discussion of the "bulk supplier doctrine" and the "sophisticated user
defense," which are separate, conceptually discrete affirmative defenses
available to defendants in certain products liability actions. [629-630]
This court adopted the "bulk supplier doctrine," which allows a manufacturer-
supplier of bulk products to discharge its duty to warn end users of the
product's hazards by reasonable reliance on an intermediary who
understands the hazards and is able to pass on appropriate warnings to end
users, as an affirmative defense to claims of negligent failure to warn [631-
634] and breach of warranty failure to warn [637-638] in products liability
actions.
In a products liability action brought against manufacturer-suppliers of flam-
mable chemicals, asserting claims for failure to warn under both negligence
and breach of warranty theories, the judge's instructions to the jury on the
"bulk supplier doctrine" as a defense to the plaintiffs' negligence claim did
not constitute reversible error [634-636], and fairly, completely, and ac-
curately apprised the jury of the elements of reasonable reliance [638].
In a products liability action brought by employees against their employer and
manufacturer-suppliers of flammable chemicals used in their workplace,
asserting claims for failure to warn and faulty design, the judge properly
instructed the jury on the defendants' duty to warn [638-639]; properly
admitted in evidence certain regulations of the Occupational Safety and
Health Administration which were relevant to the standard of care owed by
the employer to its employees [639-640]; and properly declined to give an
absent witness instruction not warranted by the circumstances [640-641].

[1]Of the estate of Remolindo Hoffman for the use and benefit of Remolindo
Hoffman and Ivany S. Hoffman.

[2]Unocal Chemicals Division, Union Oil Company of California.

[3]Marie Jose Guerreiro and Timothy Wickstrom, coadministrators of the
estate of Jose Sobrinho; Maria P. Soares, Geovani Francisco Sobrinho, and Jo-
siana S. Sobrinho, minors who bring this suit by and through Marie Jose
Guerreiro and Timothy Wickstrom, coadministrators of the estate of Jose So-
brinho vs. Houghton Chemical Corporation and Unocal Chemicals Division,
Union Oil Company of California.

CIVIL ACTION commenced in the Superior Court Department on October 3, 1989.

The case was tried before *Maria I. Lopez*, J.

The Supreme Judicial Court on its own initiative transferred the case from the Appeals Court.

*Richard T. Tucker* for the plaintiffs.

*Joseph A. Regan* for Houghton Chemical Corporation.

*F. Dore Hunter* (*Michael J. Calabro* with him) for Unocal Chemicals Division, Union Oil Company of California.

The following submitted briefs for amici curiae:

*Hugh F. Young, Jr.*, of Virginia, *David R. Geiger, & Hilary J. Ames* for The Product Liability Advisory Council, Inc.

*Douglas K. Sheff, John J. St. Andre, & Jodi Petrucelli* for The Massachusetts Academy of Trial Attorneys.

MARSHALL, C.J. On March 6, 1989, an explosion and fire ripped through Gotham Ink of New England, Inc. (Gotham), an ink manufacturer in Marlborough. The blast killed two workers and severely injured several others. The plaintiffs commenced these personal injury and wrongful death actions against three manufacturers and suppliers of the chemicals allegedly involved in the conflagration: Exxon Company, U.S.A. (Exxon); Unocal Chemicals Division, Union Oil Company of California (Unocal); and Houghton Chemical Corporation (Houghton).[4] After nearly six weeks of testimony at a consolidated trial on the plaintiffs' claims for negligence and breach of warranty for faulty product design and failure to warn, the jury returned special verdicts in favor of all defendants, and the complaints were dismissed. The plaintiffs filed a motion for a new trial that was denied. The plaintiffs have appealed, and we transferred the

[4]The plaintiffs originally joined Gotham's parent company, Superior Printing Ink Company, Inc., named as a defendant, but all claims against that company were dismissed before trial. Prior to trial, Sobrinho died of other causes and his estate was substituted as a plaintiff. In addition to suits brought by the estate of Remolindo Hoffman and Jose Sobrinho and his wife and two children (now represented by the Sobrinho coadministrators), the estate of Valmir Ferreira also claimed against the defendants. Two other cases against the defendants, by Ubiratan Santo and by Harry and Dorothy Lynch, respectively, were also consolidated for trial but dismissed before trial.

cases to this court on our own motion.[5] A pivotal question in this appeal concerns the duty of a bulk supplier to warn all foreseeable users of the risks associated with a product's use. We adopt the "bulk supplier doctrine" as an affirmative defense in products liabilities actions, and affirm the judgments.

I

The trial record is voluminous; we summarize only the evidence on which the jury could have based their verdicts that is relevant to the issues on appeal.

The defendants manufacture and supply chemical products in bulk. Unocal supplied Gotham with acetone and methanol in fifty-five-gallon drums. Unocal and Houghton supplied Gotham with toluene, which was delivered by tanker truck and stored in Gotham's large underground storage tanks. All three chemicals, which were involved in the tragic explosion, are highly volatile, flammable solvents.

There was extensive testimony concerning the nature and extent of instructions and warnings given by the defendants to Gotham. Prior to the date of the explosion and in the course of their dealings with Gotham, both Unocal and Houghton periodically supplied Gotham with documents detailing the properties and safe handling of the chemicals. Houghton gave Gotham material safety data sheets (MSDS) for toluene that had been supplied by the manufacturer, Exxon. The MSDS warned the company, among other things, to keep toluene away from sparks and static electricity. The MSDS also contained "empty drum warnings," advising Gotham of the specific dangers relating to the reuse of empty containers.[6] Houghton also provided its own empty drum warnings to Gotham.

---

[5]The plaintiffs appealed from the denial of the motion for a new trial and from the judgment. Exxon and Houghton had brought cross claims against each other for indemnity. All claims against Exxon and all claims of Ferreira's estate have been resolved.

[6]The "empty drum" warnings advised Gotham that empty containers retained residue (liquid and vapor) and can be dangerous, and may explode and cause injury or death. The material safety data sheets (MSDS) also advised that empty drums should be completely drained, properly bunged, and promptly returned to a drum reconditioner, to permit removing drum residue by flame or other means, then repainting and recoating the drum.

Unocal gave Gotham MSDS for acetone and methanol that had similar warnings about product flammability, the need to avoid contact with ignition sources, and the importance of not storing the product in unreconditioned drums. Additionally, Unocal issued drum label warnings with its methanol and acetone products, and its drum labels indicated in words and pictorially that the drum contents were flammable.

The defendants had ample reason to believe that Gotham was a knowledgeable purchaser of their products, able to understand the product warnings and to pass appropriate safety warnings on to their employees. As an ink manufacturer for the industrial market, Gotham annually purchased thousands of gallons of flammable chemicals. In compliance with Occupational Safety and Health Administration (OSHA) regulations, the company had grounding devices in its receiving and production areas designed to dissipate any static charge accumulated in the transfer of chemical solvents from one container to another.

Gotham also had an independent obligation under OSHA regulations to train employees about workplace safety. The evidence established that, although the company was not in full compliance with an OSHA-mandated hazard communication program for training and providing safety information to employees,[7] Gotham periodically conducted safety meetings with its employees. Additionally, its supervisors and laboratory personnel often reminded employees of the importance of bonding and grounding when transferring solvents. For Portuguese-speaking workers, such as the plaintiffs' decedents Hoffman and Sobrinho, whose knowledge of English was limited, the warnings were given in Portuguese by a bilingual foreman and his son.

The evidence established that, prior to the explosion, Gotham had on hand a small library of books and other materials by the defendants, other suppliers, and noted authorities concerning the safe transfer of flammable solvents. In December, 1987, Gotham issued its own MSDS to its customers of "press wash," a clean-

---

[7]See 29 C.F.R. § 1910.1200(b) (1988), which required employers "to provide information to their employees about the hazardous chemicals to which they are exposed," including chemicals to which employees "may be exposed under normal conditions of use or in a foreseeable emergency."

ing solvent composed of equal parts of acetone, methanol, and toluene.[8] The Gotham MSDS correctly advised that press wash was an OSHA 1B flammable liquid that was 100% volatile and that required special precautions in handling, including avoiding exposure to sparks and grounding all vessels when pouring from one container to another.

The jury reasonably could have found that Gotham, although aware of its obligations to provide a safe workplace and able to carry out those obligations, was lax in its safety procedures. Of relevance here, the company allowed workers to use unreconditioned drums to transfer chemical solvents and to place containers of flammable solvents on dollies with nonconductive wheels. There was no evidence that the defendants were aware that Gotham had not enforced the safety precautions as advised by Houghton and Unocal.

On the day in question, the decedent Remolindo Hoffman, who had been instructed to prepare a batch of press wash, was transferring toluene from a grounded pump in the production area to a rusty, unreconditioned drum containing residue from a previous batch of press wash. A jury reasonably could have found that Hoffman used an ungrounded dolly to place the "empty" drum on the grounded weighing scale, and that he dispensed the toluene without attaching back-up grounding clips to the drum. The ungrounded solvent transfer created a static spark that ignited vapors in and around the drum, causing the blast.

## II

### A

At the close of the evidence, the trial judge, over the plaintiffs' objection, instructed the jury on the so-called "bulk transfer doctrine" set out in the margin.[9] To evaluate this chal-

---

[8]Title 29 C.F.R. § 1910.1200(g) (1988) required that such MSDS be prepared by all chemical manufacturers and importers for all of the hazardous chemicals they produce or import.

[9]"I'm also going to now instruct you with regards to this duty to warn on a — the Bulk Transfer Doctrine. A bulk manufacturer or supplier of a product has no duty to issue warnings to the ultimate user if the warnings it has given

lenged instruction for error, we must inquire whether the instruction should have been given, and, if so, whether the instruction as given was proper. To both we answer in the affirmative.

### B

Because the plaintiffs claim that the judge instructed the jury on the "bulk transfer/sophisticated user" doctrine, we resolve first some thorny issues of terminology. There is confusion, including by the plaintiffs, between the "bulk supplier doctrine" and the "sophisticated user defense." These are separate, conceptually discrete affirmative defenses available to defendants in certain products liability actions. See *Donahue* v. *Phillips Petroleum Co.*, 866 F.2d 1008, 1012 (8th Cir. 1989).[10]

The bulk supplier doctrine allows a manufacturer-supplier (supplier) of bulk products, in certain circumstances, to discharge its duty to warn end users of a product's hazards by reasonable reliance on an intermediary. See *Forest* v. *E.I. DuPont de Nemours & Co.*, 791 F. Supp. 1460, 1463 (D. Nev.

to the immediate purchaser are adequate and sufficient, and it, that is, the manufacturer or supplier, has no reason to anticipate any negligence or other fault on the part of the immediate purchaser.

"You may find that [the] defendants complied with their duty to warn if they had no indication that the immediate purchaser, which would be Gotham in this case, was inadequately trained, or unfamiliar with the product, or incapable of passing on its knowledge about the product to the ultimate users of the product. The application of this doctrine turns on the reasonableness of the defendants' reliance on Gotham to provide adequate warnings. If you find that the product here was delivered in bulk and that the immediate purchaser was in the best position to monitor the provision of warnings to its individual employees or users, and train its individuals [*sic*] and employees, you may find that the supplier of a bulk product had no duty to warn the individual users of the purchaser or the individual employees of the purchaser of the product's dangerous properties."

[10]The bulk transfer doctrine is most commonly termed the "bulk supplier doctrine" or the "bulk seller doctrine," but it has also been identified by other terms, including the "sophisticated buyer," the "responsible intermediary," and the "sophisticated user/bulk supplier" defense or doctrine. The "sophisticated user" defense also has many aliases, including the "knowledgeable user" and the "responsible intermediary" defense or doctrine. The lack of uniform nomenclature in this area confounds an already complex field. Because we hesitate to add to the chorus of confusion, we shall refer throughout this opinion to the most commonly used terms, "bulk supplier doctrine" and "sophisticated user defense," respectively, unless quoting directly from the parties or the judge.

1992); *Jones* v. *Hittle Serv., Inc.*, 219 Kan. 627, 637 (1976). In contrast, the sophisticated user defense protects a supplier from liability for failure to warn when the end user knows or reasonably should know of a product's dangers. *Donahue* v. *Phillips Petroleum Co.*, *supra* at 1012 (applying Missouri law). For the bulk supplier doctrine to apply, a product must be delivered in bulk to an intermediary vendee. The relevant inquiry turns on the intermediary's knowledge of a product's hazard and its ability to pass on appropriate warnings to end users. See, e.g., *Sara Lee Corp.* v. *Homasote Co.*, 719 F. Supp. 417, 424 (D. Md. 1989). The sophisticated user defense, on the other hand, requires no intermediating relationship and need not involve bulk transactions; the relevant inquiry turns on the end user's level of sophistication. See *Hall* v. *Ashland Oil Co.*, 625 F. Supp. 1515, 1520 (D. Conn. 1986).

Both doctrines seek to advance the goal of products liability law to prevent accidents. The bulk supplier doctrine applies where a warning is necessary to apprise end users of product hazards. See, e.g., *Adams* v. *Union Carbide Corp.*, 737 F.2d 1453, 1457 (6th Cir.), cert. denied, 469 U.S. 1062 (1984). The sophisticated user doctrine applies where a warning will have little deterrent effect. Cf. *Bavuso* v. *Caterpillar Indus., Inc.*, 408 Mass. 694, 699 (1990), quoting *Colter* v. *Barber-Greene Co.*, 403 Mass. 50, 59 (1988) ("where the danger presented by a given product is obvious, no duty to warn [exists] because a warning will not reduce the likelihood of injury"). Put another way, the bulk supplier doctrine allows a fact finder to find that the duty to warn has been satisfied; the sophisticated user doctrine allows the fact finder to determine that no such duty was owed.[11]

Manifestly, the jury instruction at issue here concerned only

[11]We recognize that some courts have held that, under the bulk seller doctrine, the manufacturer-supplier has "no duty" to warn end users. See, e.g., *Ditto* v. *Monsanto Co.*, 867 F. Supp. 585, 593 (N.D. Ohio 1993), aff'd, 36 F.3d 1097 (6th Cir. 1994); *Cohen* v. *Steve's Ice Cream*, 737 F. Supp. 8, 9 (D. Mass. 1990) (holding that Massachusetts would decide that bulk seller has "no duty" to warn ultimate consumers when reliance on intermediary is reasonable). While the end result may be the same, it is more consistent with our precedents to analyze the duty as one that may be discharged rather than obviated. See Part II C, *infra*.

the bulk supplier doctrine. The instruction directed the jury to determine whether the products were delivered in bulk; to assess whether the defendants gave "adequate and sufficient" warning about the products to the "immediate purchaser" (that is, to Gotham); and to determine whether the defendants' reliance on Gotham to warn the ultimate users of the products was reasonable in light of the latter's sophistication and ability to pass on its knowledge of product hazards. See *Forest* v. *E.I. DuPont de Nemours & Co., supra.* The instruction did not permit the jury to find that the defendants had *no* duty to warn the plaintiffs of the products' dangers, nor did it require the jury to assess the degree of the plaintiffs' sophistication about the products' dangers. We therefore consider only whether a "bulk supplier" jury instruction is consistent with our law.

## C

The bulk supplier doctrine originates in the Restatement (Second) of Torts § 388 comment n (1965).[12] See generally Cheney, Not Just for Doctors: Applying the Learned Intermediary Doctrine to the Relationship Between Chemical Manufacturers, Industrial Employers, and Employees, 85 Nw. U. L. Rev. 562 (1991). Comment n addresses the duty to warn in that wide array of commercial contexts in which products are supplied to an intermediary, who in turn supplies the products, often repackaged or reformulated, to others. In such circumstances, the supplier's duty to warn may be discharged by informing the intermediary of the product's character and the care required to use the product safely. Restatement (Second) of Torts, *supra.* To avoid liability for failure to warn, however, the supplier must

---

[12]Restatement (Second) of Torts § 388 (1965) provides: "One who supplies directly or through a third person a chattel for another to use is subject to liability to those whom the supplier should expect to use the chattel with the consent of the other or to be endangered by its probable use, for physical harm caused by the use of the chattel in the manner for which and by a person for whose use it is supplied, if the supplier (a) knows or has reason to know that the chattel is or is likely to be dangerous for the use for which it is supplied, and (b) has no reason to believe that those for whose use the chattel is supplied will realize its dangerous condition, and (c) fails to exercise reasonable care to inform them of its dangerous condition or of the facts which make it likely to be dangerous."

have "reasonable assurance that the information will reach those whose safety depends upon their having it." *Id.*

The reasonableness inquiry is fact intensive; no bright-line rule can "automatically determine" when reliance on the intermediary is reasonable. *Id.* See *Ditto* v. *Monsanto Co.*, 867 F. Supp. 585, 592 (N.D. Ohio 1993), aff'd, 36 F.3d 1097 (6th Cir. 1994), quoting *Adkins* v. *GAF Corp.*, 923 F.2d 1225, 1230 (6th Cir. 1991). Among the factors that may determine reasonable reliance are "(1) the dangerous condition of the product; (2) the purpose for which the product is used; (3) the form of any warnings given; (4) the reliability of the third party as a conduit of necessary information about the product; (5) the magnitude of the risk involved; and (6) the burden imposed on the supplier by requiring that he directly warn all users." *Sara Lee Corp.* v. *Homasote Co.*, *supra* at 421, quoting *Goodbar* v. *Whitehead Bros.*, 591 F. Supp. 552, 557 (W.D. Va. 1984), aff'd sub nom. *Beale* v. *Hardy*, 769 F.2d 213 (4th Cir. 1985).

Our previous decisions concerning a product liability defendant's duty to warn have been guided by the Restatement (Second) of Torts § 388 generally, and by comment n specifically. See, e.g., *Bavuso* v. *Caterpillar Indus., Inc.*, *supra* at 700; *Slate* v. *Bethlehem Steel Corp.*, 400 Mass. 378, 381-382 (1987); *MacDonald* v. *Ortho Pharmaceutical Corp.*, 394 Mass. 131, 135-136, cert. denied, 474 U.S. 920 (1985); *Schaeffer* v. *General Motors Corp.*, 372 Mass. 171, 174 (1977).

In *MacDonald* v. *Ortho Pharmaceutical Corp.*, *supra*, we held that a supplier of a potentially dangerous product has a duty to warn all foreseeable users of known or reasonably foreseeable hazards of the product's use, but that, in certain limited circumstances, "a manufacturer may be absolved from blame [for failure to warn] because of a justified reliance upon . . . a middleman," so long as such reliance is reasonable. *Id.*, quoting *Carter* v. *Yardley & Co.*, 319 Mass. 92, 99 (1946), and citing Restatement (Second) of Torts, *supra*. We explained that, in such circumstances:

> "[T]he manufacturer's immunity from liability if the consumer does not receive the warning is explicable on the grounds that the intermediary's failure to warn is a

> superseding cause of the consumer's injury, or, alterna-
> tively, that, because it is unreasonable in such circum-
> stances to expect the manufacturer to communicate with
> the consumer, the manufacturer has no duty to warn the
> consumer."

*Id.* at 136.

We can imagine few more appropriate circumstances in which
to apply these principles than in the context of bulk sales. First,
as a practical matter, the nature and function of bulk products
are different from those of many other consumer and industrial
goods and thus require separate consideration. Bulk products
often are delivered in tank trucks, box cars, or large industrial
drums, and stored in bulk by the intermediary, who generally
repackages or reformulates the bulk product. Even if the product
*could* be labeled by the supplier, any label warnings provided to
the intermediary would be unlikely to reach the end user. Often,
too, the bulk product has multitudinous commercial uses.
Toluene, for instance, is used in gasoline, as well as printing
ink; acetone is an ingredient of both nail polish remover and
press wash; methanol, another press wash component, com-
monly known as "wood alcohol," is used in antifreeze. To
impose on bulk suppliers a duty to warn all foreseeable end us-
ers *directly* where the product cannot readily be labeled for such
users (if it can be labeled at all); where the intermediary is
often in a different industry from that of the supplier, with dif-
ferent means of production; and where the end users themselves
are a remote and varied lot would be unduly, indeed crushingly,
burdensome. See, e.g., *Ditto* v. *Monsanto Co., supra* at 592, cit-
ing *Cohen* v. *Steve's Ice Cream,* 737 F. Supp. 8 (D. Mass. 1990);
*Fisher* v. *Monsanto Co.,* 863 F. Supp. 285, 289 (W.D. Va. 1994);
*Forest* v. *E.I. DuPont de Nemours & Co., supra* at 1465; *Jones*
v. *Hittle Serv., Inc., supra* at 637-638.

Second, the intermediary vendee, particularly the large
industrial company, has its own independent obligation to
provide adequate safety measures for its end users, an obliga-
tion on which bulk suppliers should be entitled to rely. The bulk
supplier rarely has any control over the intermediary's person-
nel policies or day-to-day safety operations. See *Forest* v. *E.I.
DuPont de Nemours & Co., supra; Sara Lee Corp.* v. *Homasote*

*Co., supra* at 424; *Reed* v. *Pennwalt Corp.*, 22 Wash. App. Ct. 718, 723-724, aff'd, 93 Wash. 2d 5 (1979). Thus, the bulk supplier simply is "not in a position to constantly monitor the turnover of an employer's workforce" or "to provide the good housekeeping measures, training and warnings to [the intermediary's] workers on a continuous and systemic basis." *Fisher* v. *Monsanto Co., supra* at 289, quoting *Goodbar* v. *Whitehead Bros., supra* at 566.[13] In the oft-quoted words of the authors of comment n: "Modern life would be intolerable unless one were permitted to rely to a certain extent on others' doing what they normally do, particularly if it is their duty to do so." Restatement (Second) of Torts, *supra.*

The goal of products liability law is to "induce conduct that is capable of being performed." *Vassallo* v. *Baxter Healthcare Corp.*, 428 Mass. 1, 21 (1998). The bulk supplier doctrine advances that goal by permitting a bulk supplier to satisfy its duty to warn by reasonable reliance on an intermediary who understands the product's risks and is able to pass on to end users warnings about the product's hazards.[14] Under the bulk supplier doctrine, the bulk supplier is by no means absolved of its duty either to supply adequate warnings to the intermediary or to ensure that its reliance on the intermediary is reasonable, but is permitted to discharge its duty to warn in a responsible and practical way that equitably balances the realities of its business with the need for consumer safety. We adopt the bulk supplier doctrine as an affirmative defense to products liability negligence claims. See Part II E, *infra* (breach of warranty claims).

## D

We now turn to the issue whether the bulk supplier instruc-

---

[13]See *Mason* v. *Texaco Inc.*, 862 F.2d 242, 246 (10th Cir. 1988) (bulk supplier not required to police adequacy of warning given by distributor); *Forest* v. *E.I. DuPont de Nemours & Co.*, 791 F. Supp. 1460, 1465 (D. Nev. 1992) (it would be "wasteful, and at times counter-productive," for manufacturers to try to duplicate employer's obligation to warn end users).

[14]It is undoubtedly for this reason that the bulk supplier doctrine has, in various forms, been followed by "[a]lmost every court that has considered [it]." *Forest* v. *E.I. DuPont de Nemours & Co., supra* at 1465 & n.7 (collecting cases). See D.B. Dobbs, Torts § 366, at 1013 (2000) ("Sellers of bulk materials to intermediaries are seldom required to warn end-users of the product's dangers").

tion given by the judge was proper in this case. We conclude that, in all respects but one, the instruction clearly, adequately, and correctly explained the applicable law to the jury. See *Torre* v. *Harris-Seybold Co.*, 9 Mass. App. Ct. 660, 678-679 (1980). See also *Back* v. *Wickes Corp.*, 375 Mass. 633, 638 (1978) (correctness of jury charge "determined not in the abstract, but by reference to the state of the evidence in the case"). The instruction properly required that the jury consider whether the defendants supplied their products in bulk; whether they gave "adequate and sufficient" warning; whether they had no reason "to anticipate any negligence or other fault" on the part of Gotham; and whether the defendants "had no indication" that Gotham "was inadequately trained, or unfamiliar with the product, or incapable of passing on its knowledge about the product to the ultimate users of the product." The jury were further instructed that the "application of this doctrine turns on the reasonableness of the defendants' reliance on Gotham to provide adequate warnings." See Part II A, *supra*. All these instructions were proper.[15]

However, the judge also instructed the jury to consider whether Gotham, as an employer, "was in the best position to monitor the provision of warnings to its individual employees or users, and train its individuals and employees." We recognize that such "best position" language is found in other bulk supplier decisions, generally to explain why the bulk supplier doctrine is sound public policy. See, e.g., *Forest* v. *E.I. DuPont de Nemours & Co.*, *supra* at 1465 ("far better position"); *Sara Lee Corp.* v. *Homasote Co.*, *supra* at 422 ("better position").[16] However, we think that requiring a jury to assess in hindsight whether the bulk supplier or the immediate purchaser was in the "best position" to convey adequate warnings of a product's dangers injects a measure of uncertainty, of arbitrariness that

---

[15]Because we conclude that the "bulk supplier doctrine" instruction was proper, we need not address Unocal's separate claim that it supplied only "[r]elatively small quantities" of its product, and was not a bulk supplier.

[16]Some of our previous design defect cases have employed similar language. E.g., *Colter* v. *Barber-Greene Co.*, 403 Mass. 50, 57 (1988) (holding manufacturer liable for design defect because manufacturer "is in the best position to recognize and eliminate the design defects"); *Uloth* v. *City Tank Corp.*, 376 Mass. 874, 880-881 (1978).

undercuts the very raison d'etre of the doctrine, and may mislead a jury about the applicable law. All that is required to determine whether the bulk supplier has discharged its duty to warn is for the jury to evaluate the reasonableness of the bulk supplier's reliance on the intermediary. This is an objective standard. *Sara Lee Corp.* v. *Homasote Co.*, *supra* at 424. To overlay this inquiry with a second, subjective "weighing" requirement is unlikely to advance consumer safety, but is highly likely to create the kind of uncertainty that increases production costs and spurs on litigation.

The "best position" language of the judge's bulk supplier doctrine instruction, then, was given in error. However, as the faulty instruction increased the defendants' burden, not that of the plaintiffs, there was no reversible error. See *Galvin* v. *Welsh Mfg. Co.*, 382 Mass. 340, 343 (1981) (no reversible error unless claimed error affects party's substantial rights).

E

The plaintiffs claim that the bulk supplier instruction allowed the jury to confuse the defendants' duty to warn under the plaintiffs' negligence theory with the defendants' duty to warn under the plaintiffs' breach of implied warranty theory. The argument is unavailing.

The record makes clear that the judge's bulk supplier instruction was given under the negligence charge and that she was careful expressly to separate her negligence from her strict liability instructions.[17] The judge also allowed jurors to have copies of her instructions during deliberations, further obviating any possibility that her clearly delineated instructions would be confused. When jurors, during deliberations, posed a question to the judge about the scope of the bulk supplier doctrine, she

---

[17]After giving general instructions, the judge told the jury: "I am now going to instruct you on the products liability law that applies in this case, and we have, as you know, a negligence claim and a breach of warranty claim." She subsequently instructed the jury that the plaintiffs had set out two alternative theories, negligence and breach of warranty, and that they were entitled to recover if they proved the elements of either theory. Next, the judge prefaced her negligence instruction: "Now with regards to negligence. . . ." Similarly, she prefaced her breach of implied warranty instruction: "Now I am going to instruct you on the breach of warranty claim."

conferred at length with counsel and returned a response to which the plaintiffs, but not the defendants, agreed. There is, quite simply, no evidence that the negligence charge somehow migrated to and infected the jury's deliberations on the breach of implied warranty claim.

We do note that the jury reached their determination on the breach of implied warranty claim prior to our deciding *Vassallo v. Baxter Healthcare Corp., supra.* In that case, we rejected the much-maligned "hindsight" analysis of the duty to warn in implied warranty failure to warn cases. That analysis required a manufacturer or supplier to warn foreseeable users of all risks associated with a product, regardless of whether such risks were or reasonably could have been known at the time the warning was given. *Id.* at 20-23. Joining the majority of jurisdictions and the authors of the Restatement (Third) of Torts: Products Liability § 2(c) (1998), we expressly incorporated a reason-ableness analysis into an implied warranty failure to warn claim, holding that "a defendant will not be held liable under an implied warranty of merchantability for failure to warn or provide instructions about risks that were not reasonably foreseeable at the time of sale or could not have been discovered by way of reasonable testing prior to marketing the product." *Id.* at 23.[18]

In *Vassallo* v. *Baxter Healthcare Corp., supra,* we impli-citly recognized that negligent failure to warn and failure to warn under breach of warranty are to be judged by the same standard: the reasonableness of the defendant's actions in the circumstances.[19] We expressly recognize that convergence now. Under our holding in *Vassallo,* then, an instruction on the bulk supplier doctrine may apply to both a claim of negligent failure

---

[18]Our holding in *Vassallo* v. *Baxter Healthcare Corp.,* 428 Mass. 1, 23 (1998), applied to all claims, among others, as to which an appeal was pend-ing as of the date of decision.

[19]See *Bavuso* v. *Caterpillar Indus., Inc.,* 408 Mass. 694, 699 n.8 (1990) (where verdict is based on negligent failure to warn and failure to warn under breach of warranty, "it is appropriate to analyze [the verdict] by reference to negligence precedents"). Cf. *Back* v. *Wickes Corp.,* 375 Mass. 633, 642 (1978) (although in weighing competing factors to determine fault in breach of warranty count jury focus on product's character rather than defendant's actions, "the nature of the decision is essentially the same").

to warn and a claim of breach of warranty failure to warn in products liability actions.[20]

## F

Finally, we reject the plaintiffs' contention that, even if it were proper to give an instruction on the bulk supplier doctrine, the judge's instruction was clearly erroneous because it failed to specify the "factors to be weighed" in assessing reasonable reliance. Once again, the focus of the bulk supplier doctrine "is not on the knowledge of the raw material suppliers but rather on the knowledge of the industrial purchaser." *Sara Lee Corp.* v. *Homasote Co.*, *supra* at 424. In focusing the jury's deliberations on whether the defendants had reason to anticipate fault on Gotham's part, and on Gotham's ability to understand and to pass along warnings about the products' dangerousness, the judge fairly, completely, and accurately apprised the jury of the elements of reasonable reliance. See *Torre* v. *Harris-Seybold Co.*, 9 Mass. App. Ct. 660, 678-679 (1980). No more was required.

## III

The plaintiffs raise three other issues on appeal, none novel or complex. They contend that the judge's instructions on the duty to warn were inadequate, that the judge erred in admitting certain OSHA standards in evidence, and that the judge made erroneous rulings regarding an alleged absent witness. We are unpersuaded by the plaintiffs' arguments on these issues, which we discuss briefly.

The plaintiffs claim that the judge's failure to give certain of their proposed instructions left the jury with insufficient guid-

---

[20]Other courts have reached similar results. See, e.g., *Ditto* v. *Monsanto Co.*, 867 F. Supp. 585, 591 n.4 (N.D. Ohio 1993) (Ohio law); *Forest* v. *E.I. DuPont de Nemours & Co.*, *supra* at 1464 (Nevada law); *Higgins* v. *E.I. DuPont de Nemours & Co.*, 671 F. Supp. 1055, 1059-1060 (D. Md. 1987) (Maryland law); *Nigh* v. *Dow Chem. Co.*, 634 F. Supp. 1513, 1517 (W.D. Wis. 1986) ("The Court will leave the task of distinguishing between negligence and strict liability in the duty to warn to those who count angels on the heads of pins"), aff'd, 863 F.2d 1162 (4th Cir. 1988) (Wisconsin law); *Downs* v. *Panhandle E. Pipeline Co.*, 694 N.E.2d 1198, 1212 (Ind. Ct. App. 1998) (Indiana law); *Jones* v. *Hittle Serv., Inc.*, 219 Kan. 627, 635, 638 (1976) (Kansas law).

ance to determine the adequacy of the warnings given. There was no error. The plaintiffs have failed to identify with specificity any alleged defect in the actual wording of the jury instructions that substantially would have affected their rights. See *Galvin* v. *Welsh Mfg. Co., supra.* All that is left of their argument, therefore, is simply that they would have preferred that the jury hear their version of instructions rather than the instructions actually given by the judge. However, a "judge is under no obligation to charge the jury in the specific language requested by a party." *Corsetti* v. *Stone Co.,* 396 Mass. 1, 14-15 (1985), quoting *Cooke* v. *Walter Kidde & Co.,* 8 Mass. App. Ct. 902, 904 (1979). See *Jacobs* v. *Pine Manor College,* 399 Mass. 411, 414 (1987). We will not determine reversible error absent instructions that, taken as a whole, are incomplete, inaccurate, or otherwise improper. See *Torre* v. *Harris-Seybold Co., supra.* Such was not the case here.

Unavailing, too, is the plaintiffs' contention that OSHA regulations were improperly admitted in evidence.[21] The plaintiffs' appeal is grounded in the judge's denial of their motion in limine to preclude the OSHA regulations. However, the plaintiffs cannot rest on a motion in limine to preserve their appellate rights. See *Vassallo* v. *Baxter Healthcare Corp., supra* at 12, citing *Commonwealth* v. *Gabbidon,* 398 Mass. 1, 7 (1986). The consequence of the failure properly to object at trial is to waive the issue on appeal. See *Adoption of Carla,* 416 Mass. 510, 515 (1993).

In any event, there was nothing amiss in admitting the regulations. The OSHA regulations were relevant to, although not dispositive of, the standard of care Gotham owed to its workers to protect them from workplace hazards. See *Herson* v. *New Boston Garden Corp.,* 40 Mass. App. Ct. 779, 793 (1996). See generally *Torre* v. *Harris-Seybold Co., supra* at 671-673.

---

[21]The regulations identified in the pretrial memorandum were portions of 29 C.F.R. §§ 1910.106 and 1910.1200, in effect at the time of the incident. Section 1910.106 concerns the handling of flammable and combustible liquids and § 1910.1200 concerns hazard communications. See note 7, *supra.* The judge, correctly, refused the defendants' request to admit in evidence OSHA citations regarding the accident. See *Herson* v. *New Boston Garden Corp.,* 40 Mass. App. Ct. 779, 792 (1996).

Such evidence buttressed the defendants' defense that Gotham's actions were the sole proximate cause of the plaintiffs' injuries. It is "elemental" that the defendants had the right to assert such a defense and to support it with relevant evidence. See *Correia* v. *Firestone Tire & Rubber Co.*, 388 Mass. 342, 352 (1983). The judge did not err in admitting the OSHA standards.

We also see no merit in the plaintiffs' argument that the judge erred by failing to give an absent witness instruction, and by ordering the plaintiffs' counsel not to refer to the witness's absence in closing arguments. The principles governing absent witnesses are well established: an instruction and comment by counsel on an absent witness are proper only when, without reasonable explanation, a party fails to call a person of whom the party is aware, can bring to trial, and who "is friendly to, or at least not hostilely disposed toward the party, and who can be expected to give testimony of distinct importance to the case." *Commonwealth* v. *Zagranski*, 408 Mass. 278, 287 (1990), quoting *Commonwealth* v. *Schatvet*, 23 Mass. App. Ct. 130, 134 (1986). Because absent witness instructions and comments might unfairly prejudice a jury, they must be used with caution. *Commonwealth* v. *Zagranski, supra.* In cases where it appears that the witness is likely to be favorable to each side, no inference should be drawn from the witness's failure to take the stand. *Commonwealth* v. *Schatvet, supra* at 134 n.8. Further, a decision not to call a witness for tactical reasons does not necessarily lead to the inference that the witness's testimony would have been adverse to the nonproducing party. Cf. *Evans* v. *Multicon Constr. Corp.*, 6 Mass. App. Ct. 291, 294 (1978).

Here, for at least four reasons, the "missing" witness, Houghton's vice-president and safety manager, Joseph Lima, was not "absent" in any way that would have justified absent witness rulings favorable to the plaintiffs. First, the plaintiffs themselves could have called him. Lima was listed on their pretrial witness list, and several witnesses called by the plaintiffs testified to postaccident contacts with Lima during which a "red light-green light system" for preventing ungrounded solvent transfers purportedly was discussed.

Second, Lima's absence on surrebuttal was attributable not to

improper conduct but to Houghton's reasoned, tactical decision in the wake of the judge's limitation of testimony. The plaintiffs argue that Houghton had an obligation to call Lima on surrebuttal in response to testimony from the plaintiffs' rebuttal witness, Gotham's plant manager, Thomas Malloy. On rebuttal, Malloy, who did not testify during the plaintiffs' case-in-chief, attempted to refute the testimony of two Houghton witnesses that, prior to the date of the explosion, he had attended at least one "open house" at Houghton during which Lima demonstrated the "red light-green light" system. Houghton did request permission to call Lima and others to refute Malloy's testimony, but the judge limited Houghton to one surrebuttal witness only. That Houghton chose to call as this witness a former client, a person whom it deemed less vulnerable to cross-examination, was a tactical decision for which no sanction was appropriate.

Third, even if he had taken the stand, Lima's testimony on the red light-green light issue would have been cumulative. See *Commonwealth* v. *Schatvet, supra* at 134. Once Houghton's witnesses testified that Lima gave a tour that Malloy attended and Malloy denied it, the issue was one of credibility for the jury to decide.[22] *Uloth* v. *City Tank Corp.,* 376 Mass. 874, 882 (1978). Fourth, despite the judge's admonition to the contrary, in his closing argument the plaintiffs' counsel did refer to Lima's absence.

In these circumstances, the judge properly declined to permit the plaintiffs to capitalize on the fact that Lima did not testify. See *United States* v. *Ariza-Ibarra,* 651 F.2d 2, 12-13 (1st Cir. 1981). There was no error.

---

[22]Nor can we say that Lima's testimony would have added heft to the plaintiffs' case. Malloy himself testified on cross-examination to having told his attorney that he had no memory of attending an open house and that he had become forgetful. The defendants introduced evidence that the red light-green light system was not fail safe. Moreover, Gotham's own de facto safety manager at the time of the accident, who was called by the plaintiffs, testified on cross-examination that Malloy was reluctant, at best, to improve safety measures at Gotham. A jury could rightly find, then, that, even if Gotham had known about the red light-green light system prior to the accident, it would not have installed the system at its plant or the system would not have prevented the accident.

## IV

For all of the foregoing reasons, we affirm the judgments for the defendants.

*So ordered.*